Not Reported in F.Supp.2d                                                                    Page 1
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Robert W. JACKSON, III, Petitioner,
v.
Thomas CARROLL, Warden Delaware Correctional Center,
Respondent.
**No. Civ. 01-552-SLR.**

May 20, 2004.

Thomas A. Foley, and John S. Malik, Wilmington, Delaware, for Petitioner.

Loren C. Meyers, Chief of Appeals Division and Thomas E. Brown, Deputy Attorney General, State of Delaware, Department of Justice, Wilmington, Delaware, for Respondent.

OPINION

ROBINSON, Chief J.

I. INTRODUCTION

**\*1** On August 13, 2001, petitioner filed a petition for habeas corpus in the United States District Court for the District of Delaware for relief from his March 30, 1993 conviction by a Delaware State Superior Court jury. (D.I.1) On August 14, 2002, with leave of the court, petitioner filed an amended and superceding petition in light of the Supreme Court decision in *Ring v. Arizona,* 536 U.S. 584 (2002). (D.I.10) On May 9, 2003, the State answered the petition.

On January 15, 2004, petitioner filed his opening brief in support of his application for a writ of habeas corpus. (D.I.24) On February 28, the State filed its answering brief (D.I.28) and on March 9, 2004, petitioner filed a reply brief. (D.I.30) The issues raised in the amended petition have been fully briefed and, therefore, are ripe for decision. For the reasons discussed below, the court will deny petitioner's request for relief.

II. BACKGROUND

A. Procedural Background

On March 30, 1993, petitioner Robert W. Jackson, III, was convicted by a Delaware State Superior court jury of first degree intentional murder, first degree felony murder, second degree burglary, second degree conspiracy, first degree robbery and three counts of possession of a deadly weapon during commission of a felony. Following a penalty hearing, petitioner was sentenced to death by lethal injection. Presiding over petitioner's trial in Superior Court was the Honorable Vincent A. Bifferato. Petitioner's trial counsel were Lawrence I. Levinson and Kevin J. O'Connell.

In his first direct appeal to the Delaware Supreme Court, petitioner's convictions were affirmed; however, the Delaware Supreme Court vacated petitioner's death sentence and remanded the matter for a new penalty hearing. *Jackson v. State,* 643 A.2d 1360 (Del.1994), *cert denied* 513 U.S. 1136 (1995) (*Jackson I* ). In vacating petitioner's sentence, the Delaware Supreme Court ruled that the State had violated petitioner's Sixth Amendment right to counsel by tape recording telephone conversations between petitioner and a police informant which were offered as evidence during the 1993 penalty hearing. *Id.*

The second penalty hearing was held in September 1995. That jury recommended a death sentence which was imposed on October 26, 1995. At the second penalty hearing, petitioner was represented by Thomas A. Foley and Kevin J. O'Connell. The Delaware Supreme Court affirmed petitioner's sentence on his second direct appeal. *Jackson v. State,* 684 A.2d 745 (Del.1996), *cert denied* 520 U.S. 1171 (1997).

The case was then remanded back to the Superior Court for post-conviction proceedings. Following a June 12, 1997 representation hearing, the court appointed, at petitioner's request, Thomas A. Foley and John S. Malik as petitioner's post-conviction counsel. On August 21, 1997, petitioner filed a state petition for post conviction relief alleging a Sixth and Fourteenth Amendment claim predicated on ineffective assistance of counsel; a Fifth, Sixth and Fourteenth Amendment claim predicated upon the perjured testimony of a witness and the State's failure to disclose *Brady* material. The Superior Court directed that petitioner's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

trial counsel submit affidavits responding to petitioner's ineffective assistance claims, which were filed in January 1998. On August 21, 1998, an evidentiary hearing was held where the Superior Court heard testimony from an expert on death penalty cases. Following the briefing, the Superior Court directed petitioner's counsel to submit applications to retain forensic experts, which applications were subsequently denied.

**\*2** On July 16, 1999, a second evidentiary hearing was conducted where the Superior Court heard testimony from petitioner's 1993 trial counsel. On August 25, 1999, the Superior Court issued a memorandum opinion denying petitioner's motion for post-conviction relief. *State v. Jackson,* Cr. A. Nos. IN92-04- 1222-R1 through IN92-04-1349-R1 (Del.Supr. Aug. 25, 1999). Petitioner subsequently appealed to the Delaware Supreme Court, which affirmed the Superior Court's denial. *Jackson v. State,* 770 A.2d 506 (Del.2001) (*Jackson II* ).

On August 13, 2001, petitioner filed a petition for habeas corpus in the United States District Court for the District of Delaware. (D .I. 1) On August 14, 2002, with leave of the court, petitioner filed an amended and superceding petition in light of the Supreme Court decision in *Ring v. Arizona,* 536 U.S. 584 (2002). (D.I.10) On September 23, 2002, the court granted a motion to retain experts. (D .I. 11) On October 15, 2002, the court granted a motion to expend CJA funds to hire forensic experts. (D.I.12)

B. The Girardi Murder

The facts evinced at trial reflected the following events. [FN1] On the afternoon of April 3, 1992, petitioner and Anthony Lachette were driving in petitioner's automobile when they decided they would burglarize a home in order to purchase marijuana. Lachette suggested the home of Elizabeth Girardi in Hockessin, Delaware. Lachette knew one of the Giradi's children and had reason to believe there would be valuables there to pawn. *Jackson I,* 643 A .2d at 1363.

> FN1. The court draws the following facts from a number of sources: the Delaware Supreme Court's July 16, 1994 opinion on petitioner's direct appeal

from conviction, *Jackson I,* 643 A.2d at 1360; the Superior Court's October 26, 1995 sentencing decision (D.I. 25 at 64); the Superior Court's August 25, 1999 memorandum opinion on post-conviction relief (D.I.14); the Delaware Supreme Court's May 15, 2001 opinion regarding post-conviction relief, *Jackson II,* 770 A.2d at 506; and this court's independent review of the record of the superior court proceedings and the parties' briefs. (D.I. 13; D.I. 14; D.I. 24; D.I. 28; D.I. 30)

Upon arriving at the Girardi house, in broad daylight, Jackson parked his car in the driveway leading to the house. It appeared to the would-be burglars that nobody was home, so they proceeded to break and enter the house through a rear door. Once inside the home, petitioner and Lachettee, each wearing gloves, ransacked the house in their pursuit of valuables. They located various items including jewelry, rare coins, a camera, compact discs and firecrackers which they placed into paper bags. *Id.*

Upon exiting the house, petitioner and Lachettee proceeded around the corner of the house and discovered that Girardi had returned home and was walking toward petitioner's car. Lachette dropped his bag and fled the scene ignoring petitioner's efforts to persuade him to stay. After Lachette ran several hundred yards, he heard petitioner calling his name. Nonetheless, Lachettee continued to flee the scene. *Id.*

Following Lachette's departure, petitioner obtained an ax from a nearby shed and confronted Girardi in the driveway. A short struggle ensued during which Girardi fell to the ground. Jackson struck Girardi several times in the face with the ax while Girardi lay on the ground. Jackson then proceeded to load the items stolen from the house into his car while Girardi lay dying in the driveway. Hearing her moaning, Jackson returned with the ax and fatally struck Giradi several more times in the face. *Id.*

**\*3** While driving away from the Girardi house, petitioner found Lachette walking along the road and picked him up. Petitioner admitted to Lachettee that he had killed Girardi. Lachette observed blood on petitioner's pants and gloves. Over the course of the following week, petitioner boasted

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 3
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

about committing the murder to Lachette and to James Burton, petitioner's roommate. *Id.*

Following the murder, police issued a bulletin to pawnbrokers about some of the items taken in the robbery. On April 9, Burton and Carl Roca, a friend of petitioner's, sold a bracelet stolen in the burglary to a pawn shop. The pawn shop contacted police. Over the next twelve hours, the police investigated the lead from the pawn shop which led police to petitioner and Lachettee. *Id.*

Lachettee confessed his involvement in the burglary and implicated petitioner in the murder. Lachette subsequently gave a full statement including petitioner's remarks about the killing. Burton, who was arrested with petitioner and Lachette, also gave police a full statement which included petitioner's inculpatory remarks regarding the murder. *Id.* Both Lachette and Burton testified at trial. *Id.* at 1364.

Other evidence also placed petitioner at the crime scene. Forensic evidence matched petitioner's sneaker tread to two footprints at the crime scene. Fibers from Girardi's carpet matched fibers present in petitioner's car. Further, a camera, coins and other items identified as missing from the home were located in petitioner's apartment. *Jackson II,* 770 A.2d at 509.

After his arrest, petitioner was placed in Gander Hill prison. While there, petitioner befriended another inmate, Andre Johnson. Petitioner solicited Johnson's assistance in a plan to murder Burton to prevent his testifying. After Johnson posted bail in August 1992, petitioner mailed Johnson a letter with a photograph of Burton, a letter and a map showing where Burton lived. *Id.*

On September 25, 1993, Johnson proceeded to reveal to prosecutors petitioner's plan to kill Burton. Police found petitioner's fingerprints on the letter sent to Johnson. At trial, Johnson testified about the plot to kill Burton. Johnson also stated that he had been given immunity with respect to his involvement in the murder plan but otherwise did not have an agreement with state prosecutors. [FN2] *Jackson I,* 643 A.2d at 1369.

       FN2. Johnson later moved to dismiss the burglary,

theft and weapons charges pending against him on the grounds that he been granted immunity on those charges as quid pro quo for his cooperation and testimony at petitioner's trial.

During the first penalty phase, the State presented evidence involving petitioner's efforts to obtain the assistance of Victor Talmo in another effort to kill Burton. Talmo had been petitioner's cell mate at Gander Hill. Petitioner offered to assist Talmo in obtaining money to post bail in exchange for Talmo's assistance in arranging for the murder of Burton. *Id.* Detective McClaren interviewed Talmo on September 21, 1992, and Talmo indicated that he had kept a journal of his conversations with petitioner. Talmo also indicated that he have been given a photo of Burton and a map to Burton's residence, but petitioner later took those items back. While McClaren did not ask Talmo to assist in obtaining information about the Girardi murder, he did ask for Talmo's assistance in obtaining information about the plot to kill Burton. *Id.* at 1370.

**\*4** These police efforts with Talmo were delayed following Andre Johnson's similar contact with investigators on September 24, 1992. In February 1993, however, Talmo received a coded letter from petitioner requesting that Talmo arrange to have Burton killed. Petitioner's letter to Talmo included a map to Burton's residence. *Id.* Talmo subsequently made contact again with investigators and was ultimately provided with a recording device to record his telephonic conversations with petitioner. Talmo taped two phone calls from petitioner in March 1993, during the early phase of petitioner's trial, and turned the tapes over to the State.

The Talmo tapes were played during the sentencing hearing and admitted into evidence, as were transcripts of the conversation. Talmo explained the cryptic conversations and the statements provide highly incriminating evidence of petitioner's intent to murder Burton in an effort to receive a plea bargain offer from the State. The evidentiary value of the Talmo tapes were that they were evidence of a new crime as well as evidence of petitioner's future dangerousness. *Id.*

On his direct appeal, petitioner successfully argued that the

Not Reported in F.Supp.2d                                                    Page 4
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

Talmo tapes were improperly obtained in violation of his Sixth Amendment rights, as Talmo was at that time acting as a state agent. *Id.* at 1373-75. As the Talmo tapes were only introduced during the penalty phase, the Delaware Supreme Court vacated the sentence and remanded for a new penalty hearing.

A second penalty hearing was held in September 1995. The State presented evidence of two statutory aggravating factors and eleven non-statutory factors. The statutory factors included that the murder was committed while petitioner was engaged in the commission of or flight from a burglary and that the murder was committed while petitioner was engaged in the commission of or flight from a robbery. 11 Del. C. § 4209 (amended 1991). The non-statutory factors included: (1) the murder was outrageously or wantonly vile, horrible or inhumane in that it involved torture and/or depravity of mind; (2) the victim was defenseless; (3) the murder was committed for pecuniary gain; (4) the murder was without provocation; (5) the murder was committed to avoid detection and to silence a witness; (6) the defendant attempted to have a state witness murdered; (7) the murder left two children without a mother; (8) the defendant's repetitive criminal conduct; (9) the future dangerousness of the defendant; (10) victim impact evidence; and (11) the defendant committed the murder in an especially heinous, cruel or depraved manner involving physical abuse of the victim and showed an utter disregard for human life murdering the victim without feeling or sympathy. (D.I. 25 at 66-67)

Petitioner offered evidence of eight mitigating circumstances, including: (1) petitioner's age; (2) petitioner's dysfunctional social history including, but not limited to, a history of mental abuse; (3) petitioner suffers from treatable mental illness(es) which cause and or contributed to the commission of the offenses of which petitioner had been convicted; (4) petitioner's relatively minimal and non-violent criminal record prior to the offenses here, and the absence of any significant history of violence as a child or adolescent; (5) redeeming personality traits of petitioner; (6) petitioner would benefit from the prison environment and could assist other prisoners and petitioner's family would continue to benefit from their relationship with

petitioner; (7) the execution of petitioner would cause a great loss to petitioner's family; (8) the execution of petitioner would not lessen the pain or loss to Girardi's family. (*Id.* at 67-68)

**\*5** The second penalty phase jury unanimously found that the statutory aggravating factors had been proven beyond a reasonable doubt. The jury also found by a vote of 11-1 that the State had proven that the aggravating factors outweighed the mitigating factors. Following the jury's verdict, the Superior Court then independently weighed the aggravating and mitigating factors, giving substantial weight to the jury's findings, and concluded that death was the appropriate punishment. (*Id.* at 77)

C. Trial Counsel

During the initial pretrial proceedings petitioner was represented by Joseph Hurley, whose fees apparently were paid by petitioner's family. Hurley withdrew from the case on October 5, 1992, having previously indicated that he would do so if the DNA test results were unfavorable to petitioner. [FN3] On November 16, 1992, after the Office of the Public Defender determined it had a conflict of interest, the Superior Court appointed Jerome M. Capone and Kevin J. O'Connell to serve as petitioner's trial counsel. This case was O'Connell's first capital case. Capone subsequently withdrew in February 1993 after learning that another client of his, Andre Johnson, would be called as a witness for the State. [FN4] Laurence I. Levinson was subsequently appointed on February 22, 1993 to serve as co-counsel with O'Connell. Prior to the case at bar, Levinson had served as counsel in five capital cases.

> FN3. At a July 26, 1992 conference before the Superior Court, Hurley had warned that he might withdraw.
> MR. HURLEY: If the DNA comes back positive, based upon the other information I have, my client's chances are extremely limited. Philosophically, if I have a situation where a family has to pay a lot of money--in his situation I don't want to take their money--to go through a dog-and-pony show, and it's my intention if came to that, it was positive, I would advise the family

Not Reported in F.Supp.2d                                                                    Page 5
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

he should have public defender representation.
That would allow 90 days for further preparation,
and I would want to file a Motion to Withdraw.
The case would be prepared at that point in time. It
wouldn't take a lot of time for somebody to pick up
the file and go forward.
THE COURT: If the family can afford--
MR. HURLEY: They have to go out and--it'll put
them in the whole rest of his life.
THE COURT: You may save his life.
MR. HURLEY: I think it's money well spent if I
think I could, but--
(D.I. 15, ex. 69 at 10-11)

FN4. Capone was appointed to represent Johnson
after he had already accepted his appointment to
represent petitioner in the present case.
Inexplicably, Capone withdrew only from
representing petitioner and not from his
representation of Johnson. During the course of
petitioner's trial, Capone was called upon by the
Superior Court to advise Johnson when Johnson
was unresponsive to questioning at trial. (D.I. 15,
Trial Tr. at 331) Incidentally, O'Connell had also
previously represented Andre Johnson in an
unrelated matter. (*Id.* at 358)

At the February 22, 1993 office conference following his
appointment, Levinson discussed with the Superior Court
the timing of his appointment.
MR. LEVINSON: Can I be ready in fourteen days for a
capital murder case?
THE COURT: You have Kevin who's been working on it.
MR. LEVINSON: My only concern when I talked to
Kevin was he told me this was his first one. What if we
get into a situation it might take me four or five fays to
get up to speed and then all of a sudden I see some
problem.
THE COURT: If we have a problem, we'll have to take a
look at it. If necessary, I'll take you off all calendar review
and trials that you have.
(D.I. 25 at 21-22) The Superior Court directed Levinson to
advise him of any pending cases in which the defendants
were not incarcerated so that the court could arrange to

delay those cases and free Levinson to focus on petitioner's
trial. (*Id.*) Although the trial judge indicated that he'd
entertain a request for a continuance if petitioner's counsel
determined that it was necessary, no such request was made.

Petitioner's counsel during the second penalty phase were
O'Connell and Thomas A. Foley. Following the Delaware
Supreme Court's affirming of the decision in the second
penalty phase, O'Connell withdrew from the case. Foley
continued to represent petitioner during his State Rule 61
post-conviction proceedings with the assistance of John S.
Malik. These same attorneys were subsequently appointed
by this court to represent petitioner for petitioner's federal
habeas proceedings.

C. Post-Trial Evidentiary Hearing

**\*6** The Superior Court held evidentiary hearings on March
11, 1994 and May 6, 1994 to determine whether Johnson
had been promised immunity beyond that which he had
stated in his testimony at petitioner's trial. The lead
prosecutor in petitioner's trial testified that Johnson was
explicitly offered only immunity on charges related to the
plot to kill Burton. [FN5]

> FN5. Johnson contended that the prosecutor had
> privately offered him leniency on the burglary,
> theft and weapons charges but was told to not tell
> anyone about the offer. The prosecutor denied
> Johnson's version of their conversation.

The prosecutor's testimony was supported by the testimony
of two police investigators. The chief investigator in
petitioner's case testified that the prosecutor had stated that
he could offer Johnson no leniency with respect to unrelated
charges. A second investigator, who was also present at the
September 25, 1993 interview with Johnson, testified that
the lead prosecutor told Johnson that he could not offer
leniency but, if Johnson continued to cooperate, there may
be such consideration in the future. The prosecutor
emphasized that no promises could be made until
petitioner's case was resolved, to which Johnson replied:
"We're all intelligent people in this room." *Jackson II,* 770
A.2d at 510.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 6
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

The prosecutor also testified that, although Johnson never explicitly stated that he expected leniency in exchange for his cooperation, he suspected that Johnson anticipated assistance in exchange for his testimony. In 1993, following petitioner's trial, the prosecutors in Johnson's case were persuaded to recommend a sentence of twenty-five years in lieu of a potential life sentence which could have been imposed as Johnson was a habitual offender.

D. State Post-Conviction Rule 61 Proceedings

In petitioner's Rule 61 proceedings, he asserted that he was denied a fair trial as result of (1) ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendment; (2) violations of the Fifth, Sixth and Fourteenth Amendment based, in part, upon perjured testimony by Andre Johnson; and (3) violations of his Sixth and Fourteenth Amendment rights as result of the failure to disclose certain impeachment evidence. Petitioner's ineffective assistance claims involved ten separate allegations of ineffectiveness.

Evidentiary hearings were held on August 21, 1998 and July 16, 1999, which focused on the petitioner's claims of ineffective assistance of counsel. At the August 21, 1998 hearing, David A. Ruhnke provided expert testimony pertaining to the conduct of petitioner's trial counsel. [FN6] Runhke opined that petitioner's trial counsel's conduct fell below an objective reasonable standard for defense counsel in a capital case.

> FN6. Ruhnke is a criminal defense attorney with a substantial amount of capital crime case experience primarily in New Jersey. In preparing for his testimony, Ruhnke reviewed court opinions, primary investigative files, trial transcripts, pre-trial transcripts, physical evidence and affidavits of trial counsel. (D.I. 25 at 81)

Ruhnke testified that a reasonably competent attorney in a capital case would need a minimum of six months of preparation time. (*Id.* at 82) Ruhnke also testified that a reasonably competent attorney in a capital case should inspect the physical evidence and verify any forensic results through independent experts. (*Id.* at 83-84) Ruhnke opined

that a reasonably competent attorney in petitioner's case would have sought to hire a fingerprint expert, handwriting expert, fiber expert, shoe print expert and a criminologist. (*Id.* at 84, 87-88, 90)

**\*7** Ruhnke advised that a private investigator should have been hired to assist in the interviews of Andre Johnson and Derrick Johnson. (*Id.* at 84- 85) Had this been done, Ruhnke asserts, trial counsel could have introduced evidence of Derrick Johnson's prior statements concerning Lachette's alleged inculpatory admissions. [FN7]

> FN7. Derrick Johnson, who coincidentally is Andre Johnson's cousin, allegedly told O'Connell that Lachettee had made self-inculpatory statements while the men were incarcerated at the same facility. (D.I. 15, March 29, 1993 Trial Tr. at 2) Derrick subsequently contacted prosecutors and recanted those statements indicating that he had lied to O'Connell in implicating Lachette and did so out of a vendetta against Lachettee. During voir dire at trial, Derrick categorically denied that he made any statements to O'Connell that implicated Lachette in the murder. (*Id.* at 15-24) Consequently, Derrick Johnson's testimony during voir dire was not only inconsistent with O'Connell's description of the prior interview but also was inconsistent with Johnson's characterization of that interview in his conversation with the prosecutors. (*Id.* at 6-7)

Ruhnke criticized petitioner's trial counsel for failing to object to the scope of Dr. Inguito's testimony. Ruhnke contended that Dr. Inguito exceeded the scope of a pathologist's expertise when he opined regarding the manner in which aspects of the murder may have occurred. (*Id.* at 86, 101-02)

Ruhnke testified that petitioner's trial counsel, prior to Andre Johnson's trial testimony, should have requested a hearing to explore whether Johnson was a state agent and whether there had been implicit promises of leniency. (*Id.* at 86, 102-03) Ruhnke also criticized petitioner's trial counsel for failing to object when Capone provided legal counsel to Andre Johnson during Johnson's testimony at trial. (*Id.* at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 7
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

87-87)

Ruhnke testified that petitioner's trial counsel also should have moved for a mistrial following the testimony of Lachette, in which Lachette gave a nonresponsive answer indicating that petitioner had a habit of committing burglaries. (*Id.* at 87)

On July 16, 1999, Levinson testified concerning his representation of petitioner during the trial and first penalty phase. (*Id.* at 107-13) Levinson had experience in capital cases, previously serving as counsel in five capital cases. He testified that he was appointed to serve as co-counsel less than three weeks before trial. Levinson testified that he declined to ask for a continuance to allow more time to prepare because he felt it was not necessary. In particular, Levinson believed that since his co-counsel, along with other attorneys, had been preparing the case for trial that there was adequate time for him to prepare. (*Id.* at 107) He also testified that, based upon his previous experience, he felt comfortable in his cross-examination of the State's forensic experts, even though he had not retained independent experts. (*Id.* at 112)

At a July 16, 1999 hearing, O'Connell gave testimony concerning his representation of petitioner during pretrial, trial and both penalty phases. (*Id.* at 113-31) O'Connell had been appointed to represent petitioner on November 16, 1992, four months before trial after Hurley withdrew from the case. O'Connell was appointed after the State Public Defenders' office had determined that an ethical conflict precluded its attorneys from representing petitioner. O'Connell, speaking retrospectively, indicated that additional preparation time would have been preferred; nonetheless, he maintained that he had adequate time to prepare for trial. *Jackson II,* 770 A.3d at 512.

The Superior Court found that no merit to petitioner's claim of error. *State v. Jackson,* Cr. A Nos. IN92-04-1222-RI through 1227-RI, IN92-04-1348-R1 and 1349-R1 (Del.Super.Aug. 25, 1999). With respect to the assertions of ineffective assistance of counsel, the court gave little weight to Ruhnke's testimony as to the trial counsel's conduct, particularly whether the preparation time was reasonable. The court found that the case was not complicated and that

there was no evidence that Levinson's late appointment caused difficulties in gaining access to witnesses or experts. *Id.* at 12.

**\*8** On appeal to the Delaware Supreme Court, petitioner limited his appeal to three specific allegations of ineffectiveness of counsel and the State's failure to disclose certain favorable impeachment evidence. *Jackson II,* 770 A.2d at 508. The Supreme Court, although affirming the Superior Court's decision, wrote to clarify the Superior Court's discussion of *Brady.*

III. STANDARD OF REVIEW

A. Exhaustion

Before seeking habeas relief from a federal court, a petitioner in state custody pursuant to a state court judgment must satisfy the procedural requirements contained in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This section states:

An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(I) there is an absence of available State corrective process; or

(B)(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). Grounded on principles of comity, the requirement of exhaustion of state court remedies ensures that state courts have the initial opportunity to review federal constitutional challenges to state convictions. *Werts v. Vaughn,* 228 F.3d 178, 192 (3d Cir.2000). If a § 2254 petition includes any unexhausted claims, it "must be dismissed without prejudice for failure to exhaust all state created remedies." *Sullivan v. State,* 1998 WL 231264, at \*14 (D.Del. Apr. 30, 1998) (quoting *Doctor v. Walters,* 96 F.3d 675, 678 (3d Cir.1996)).

To satisfy the exhaustion requirement, the state prisoner must give "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v.*

Not Reported in F.Supp.2d                                                                 Page 8
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

*Boerckel,* 526 U.S. 838, 844-45 (1999). This means that a petitioner must demonstrate that the claim was fairly presented to the state's highest court, either on direct appeal or in a post-conviction proceeding. *See Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir.1997) (citations omitted); *Coverdale v. Snyder,* 2000 WL 1897290, at *2 (D.Del. Dec. 22, 2000). If the petitioner raises the issue on direct appeal, then he does not need to raise the same issue again in a state post-conviction proceeding. *Lambert,* 134 F.3d at 513; *Evans v. Court of Common Pleas, Delaware County, Pennsylvania,* 959 F.2d 1227, 1230 (3d Cir.1992) (citations omitted).

To "fairly present" a federal claim for purposes of exhaustion, a petitioner must present to the state's highest court a legal theory and facts that are "substantially equivalent" to those contained in the federal habeas petition. *Doctor,* 96 F.3d at 678. It is not necessary for the petitioner to identify a specific constitutional provision in his state court brief, provided that "the substance of the ... state claim is virtually indistinguishable from the [constitutional] allegation raised in federal court." *Santana v. Fenton,* 685 F.2d 71, 74 (3d Cir.1982) (quoting *Bisaccia v. Attorney Gen.,* 623 F.2d 307, 312 (3d Cir.1980)). A petitioner may assert a federal claim without explicitly referencing a specific constitutional provision by: (1) relying on pertinent federal cases employing a constitutional analysis; (2) relying on state cases employing a constitutional analysis under similar facts; (3) asserting a claim in terms so particular as to call to mind a specific right protected by the United States Constitution; or (4) alleging a pattern of facts well within the mainstream of constitutional litigation. *McCandless v. Vaughn,* 172 F.3d 255, 261 (3d Cir.1999); *Evans,* 959 F.2d at 1231. Furthermore, the state court does not have to actually consider or discuss the issues in the federal claim, provided that the petitioner did, in fact, present such issues to the state court. *See Swanger v. Zimmerman,* 750 F.2d 291, 295 (3d Cir.1984).

B. Procedural Default

**\*9** A petitioner's failure to exhaust state remedies will be excused if there is no available state remedy. *Lines v. Larkins,* 208 F.3d 153, 160 (3d Cir.2000); *see Teague v. Lane,* 489 U.S. 288, 297-98 (1989). However, even though these claims are treated as exhausted, they are procedurally defaulted. *Lines,* 208 F.3d at 160. A federal court may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice or a "fundamental miscarriage of justice." *McCandless,* 172 F.3d at 260; *Coleman v. Thompson,* 501 U.S. 722, 750-51 (1999); *Caswell v. Ryan,* 953 F.2d 853, 861-62 (3d Cir.1992).

To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 (1986). A petitioner can demonstrate "actual prejudice" by showing "not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494. If the petitioner does not allege cause for the procedural default, the federal court does not have to determine whether the petitioner has demonstrated actual prejudice. *See Smith v. Murray,* 477 U.S. 527, 533 (1986).

Alternatively, a federal court may excuse procedural default if the petitioner demonstrates that failure to review the claim will result in a fundamental miscarriage of justice. *Edwards v. Carpenter,* 529 U.S. 446 (2000); *Wenger v. Frank,* 266 F.3d 218, 224 (3d Cir.2001). In order to demonstrate a "miscarriage of justice," the petitioner must show that a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier,* 477 U.S. at 496. A petitioner establishes "actual innocence" by proving that no reasonable juror would have voted to find him guilty beyond a reasonable doubt. *Sweger v. Chesney,* 294 F.3d 506, 523- 24 (3d Cir.2002).

C. Review Under the AEDPA

A federal district court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Before the court can reach the merits of such a petition, the court must first determine whether the requirements of the AEDPA are satisfied. Section 2254(d) states, in pertinent part, that:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceeding unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

**\*10** (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Based upon the language of § 2254(d)(1), a federal court cannot grant a writ of habeas corpus on a claim that was adjudicated in state court on the merits unless it finds that the state court decision either: (1) was contrary to established federal law; or (2) involved an unreasonable application of clearly established federal law. *See Williams v. Taylor,* 529 U.S. 362, 412 (2000).

The Third Circuit requires federal courts to utilize a two-step analysis when considering whether the state court decision falls into either catagory. *Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 880 (3d Cir.1999) (en banc); *see also Werts,* 228 F.3d at 197. The first step requires federal courts to identify the applicable Supreme Court precedent and then determine whether the state court decision is "contrary to" this precedent. *Matteo,* 171 F.3d at 888. "Relief is appropriate only if the petitioner shows that the 'Supreme Court precedent requires an outcome contrary to that reached by the relevant state court." ' *Werts,* 228 F.3d at 197 (quoting *O'Brien v. Dubois,* 145 F.3d 16, 24-25 (1st Cir.1998)). The petitioner cannot merely demonstrate "that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome." *Matteo,* 171 F.3d at 888. Under this standard, habeas relief cannot be granted if the federal court merely disagrees with a state court's reasonable interpretation of the applicable precedent. *Id.*

If the federal court concludes that the state court adjudication is not contrary to the Supreme Court precedent, then the court must determine whether the state court

judgment rests upon an objectively unreasonable application of clearly established federal law, as determined by the United States Supreme Court. *Id.* at 880. This analysis involves determining "whether the state court decision, evaluated objectively and on the merits, result[s] in an outcome that cannot reasonably be justified. If so, then the petition should be granted." *Id.* at 891. Moreover, "in certain cases it may be appropriate to consider the decisions of inferior federal courts as helpful amplifications of Supreme Court precedent." *Id.* at 890. However, once again, a federal court's mere disagreement with the state court's decision does not constitute evidence of an unreasonable application of Supreme Court precedent by a state court. *Werts,* 228 F.3d at 197. For example, if the state court identifies the correct legal principle, "but unreasonably applies that principle to the facts of the prisoner's case," then habeas corpus relief is appropriate. *Williams,* 529 U.S. at 413. An objectively unreasonable application of federal law is different from an erroneous or incorrect application. *See Bell v. Cone,* 535 U.S. 685, 694 (2002).

**\*11** Section 2254(d)(2) is not in issue in federal habeas petitions because the AEDPA requires a federal court to presume that a state court's determination of facts is correct. 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to both explicit and implicit findings of fact. *Campbell v. Vaughn,* 209 F.3d 280, 286 (3d Cir.2000). The petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. *Id.*

## IV. DISCUSSION

Petitioner asserts six grounds for relief in his habeas application: (1) that his trial counsel were presumptively ineffective because they were denied necessary time to prepare for his case; (2) that his trial counsel were ineffective for failing to utilize a private investigator to interview Derrick Johnson, a potential witness; (3) that his trial counsel were ineffective by failing to object to the unresponsive and prejudicial testimony of Anthony Lachette; (4) that his trial counsel were ineffective by failing to object to the testimony of the medical examiner; (5) that he was denied a fair trial by the State's failure to disclose certain favorable impeachment evidence; and (6) that Delaware's statutory scheme for the imposition of the death

Not Reported in F.Supp.2d                                                                Page 10
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

penalty violates the Sixth Amendment and the Due Process clause of the Fourteenth Amendment as interpreted by the Supreme Court in *Ring v. Arizona.* (D.I.24)

A. Exhaustion of State Remedies

As a threshold matter before reviewing the merits of petitioner's grounds for relief, the court must ascertain whether petitioner has exhausted all available state remedies. In the state proceedings before both the Superior Court and on appeal to the Delaware Supreme Court, petitioner did assert as grounds for relief claims one, two and three. *Jackson II,* 770 A.2d at 511, 514. Consequently, the court finds that with respect to those ground for relief, petitioner has exhausted his available state remedies and the court will consider the merits of those claims.

In the state court proceedings petitioner did not raise the sixth claim, namely, that Delaware's statutory scheme for imposing the death penalty violated his Sixth Amendment right to a jury trial or his due process rights under the Fourteenth Amendment as interpreted by the Supreme Court in *Ring v. Arizona.* The State, however, has expressly waived the exhaustion requirement pursuant to 28 U.S.C. § 2254(b)(3). (D.I. 16 at 32) Consequently, the court will also consider the merits of the *Ring* claim.

With respect to claims four and five, ineffective assistance of counsel predicated upon the failure to hire a private investigator and failure to object to the medical examiner's testimony, petitioner raised these claims with the Superior Court but did not appeal the Superior Court's decision to the Delaware Supreme Court with respect to these claims. *Jackson II,* 770 A.2d at 511, 514. (D.I. 14, Appellant's Opening Brief to the Supreme Court of Delaware) Accordingly, plaintiff has failed to comply with § 2254's exhaustion requirement with respect to claims four and five.

*12 Nevertheless, as an appeal to the Delaware Supreme Court would be futile because of a state procedural time bar, petitioner does not have an available state remedy and the exhaustion requirement is deemed satisfied. *See Teague,* 489 U.S. at 298. Third Circuit precedent, however, dictates that where exhaustion results from a state procedural bar, the claim is procedurally defaulted and the court must then

consider whether that procedural default may be excused. *See Lines,* 208 F.3d at 160.

A procedural default may be excused either by a showing of "cause and prejudice" or a "fundamental miscarriage of justice" sufficient to excuse the default; in the absence thereof, this court may not reach the merits of these claims. *See id.* (quotations omitted); *Caswell v. Ryan,* 953 F.2d 853, 861 (3d Cir.1992). In the present case, petitioner does not assert "cause" for failing to appeal to the Delaware Supreme Court the Superior Court's decision in his post-conviction proceedings relating to claims four and five.

Further, petitioner has also failed to demonstrate that these claims amount to a "miscarriage of justice." *See Murray v. Carrier,* 477 U.S. at 496. A "miscarriage of justice" results "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* Neither of these claims support the conclusion that petitioner is actually innocent and no reasonable jury could conclude otherwise. [FN8] *See Sweger,* 294 F.3d at 523-24. As these procedurally defaulted claims do not assert a constitutional violation that probably resulted in the conviction of one who is actually innocent, they do not amount to a miscarriage of justice. Consequently, while the court finds that, with respect to claims four and five, exhaustion is futile because of a state procedural bar, the court may not reach the merits of these two claims because of petitioner's unexcused procedural default.

> FN8. First, even if petitioner's trial counsel had subjected the medical examiner's testimony to greater scrutiny, the medical examiner's testimony was not probative of petitioner's involvement in the crime. Second, even if a private investigator had been present for the Derrick Johnson interview and thus available to testify, it is not probable that a jury would have believed that Lachettee had admitted responsibility for the murder, in light of evidence of Johnson's admitted motivation for lying.

B. Trial Counsel's Preparation For Trial

Petitioner alleges that trial counsel was denied adequate

Not Reported in F.Supp.2d                                                                                     Page 11
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

time to prepare for his trial and, as a consequence, that he was denied effective assistance of counsel. Petitioner, relying upon *United States v. Cronic,* 466 U.S. 648 (1984), asserts that the appointment of co-counsel sixteen days before trial amounts to *per se* ineffective assistance of counsel whereby prejudice may be presumed. (D.I. 24 at 22-25)

The Delaware Supreme Court noted that "[t]here is no presumption that trial counsel was ineffective simply because the court appointed Levinson as co-counsel sixteen days before jury selection." *Jackson II,* 770 A.2d at 512. The Delaware Supreme Court concluded that even if trial counsel's actions failed to meet an objective standard of reasonableness under *Cronic,* petitioner failed to satisfy the actual prejudice requirement of *Strickland* by showing "that trial counsel's deficiencies were so prejudicial that they deprived him of a fair trial." *Jackson II,* 770 A.2d at 512 (citing *Strickland v. Washington,* 466 U.S. 688 (1984)).

1. Applicable Federal Precedent

**\*13** Pursuant to *Matteo,* this court must first identify the applicable Supreme Court precedent and then determine whether the state court decision is "contrary to" this precedent. *Matteo,* 171 F.3d at 888. A Sixth Amendment claim predicated upon ineffective assistance of counsel is governed by the Supreme Court's decision in *Strickland* and its progeny. In the present case, the Delaware Supreme Court analyzed petitioner's claims under the *Strickland* standard and determined that the prejudice requirement was not met. *Jackson II,* 770 A.2d at 511 (citing *Strickland,* 466 U.S. at 668).

Petitioner suggests that the present case should be governed by the exception to *Strickland* characterized by the Supreme Court's decision in *Cronic.* The Supreme Court has clarified the narrow circumstances in which a Sixth Amendment claim may succeed in the absence of demonstrable actual prejudice, *Bell v. Cone,* 535 U.S. 685 (2002):(1) where there is a complete denial of counsel, *see, e.g., Hamilton v. Alabama,* 368 U.S. 52, 54 (1961) (failing to appoint counsel during arraignment proceedings); (2) where counsel " 'entirely fails to subject the prosecution's case to meaningful adversarial testing," ' *Bell,* 535 U.S. at 696 (quoting *Cronic,*

466 U.S. at 659), and *see, e.g. Davis v. Alaska,* 415 U.S. 308 (1974) (refusing to permit cross-examination key prosecution witness); and (3) where "counsel is called upon to render assistance under circumstances where competent counsel very likely could not," *Bell,* 535 U.S. at 696, and *see, e.g., Powell v. Alabama,* 287 U.S. 45, 53- 54 (1932) (failing to appoint counsel until morning of trial). The court finds that none of the circumstances outlined in *Bell* apply to the present case.

As this case does not fall under the narrow exceptions to *Strickland* described in *Cronic* and *Bell,* this court finds that the Delaware Supreme Court properly analyzed petitioner's claims under *Strickland.* [FN9] *See Bell,* 535 U.S. 685, 695-96 (2002) (holding that a decision is contrary to Supreme Court precedent if the state court applied a rule different from the governing law or if it decides the case differently on a set of materially indistinguishable facts). Consequently, the court concludes that the present case does not satisfy the first step under *Matteo* for federal habeas review of a state court decision.

> FN9. Petitioner has not identified any precedential authority for its argument that *Strickland* was not the appropriate standard to apply.

The second part of analysis under *Matteo* requires the court to determine whether the state court decision rests upon an objectively unreasonable application of clearly established federal law, as determined by the Supreme Court. *Matteo,* 171 F.3d at 880. In the present case, this requires a determination as to whether the Delaware Supreme Court unreasonably applied *Strickland.*

2. Strickland Standard

To prevail on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must allege and establish facts satisfying the two-part test set forth by the United States Supreme Court in *Strickland.* First, the petitioner must show that counsel's advice was unreasonable, *Strickland,* 466 U.S. at 690, and not "within the range of competence demanded of attorneys in criminal cases." *Hill v. Lockhart,* 474 U.S. 52, 56-57 (1985) (quoting *McMann v. Richardson,* 397 U.S. 759, 771 (1970)). In other words, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                           Page 12
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

petitioner must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687. A court must be highly deferential to counsel's reasonable strategic decisions when analyzing his performance. *Id.* at 689.

**\*14** Second, the petitioner must demonstrate that he was actually prejudiced by counsel's errors. *Strickland,* 466 U.S. at 694. In this regard, the petitioner need not demonstrate that the outcome of the proceeding would have been different, only that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The court is not engaging in a prophylactic exercise to guarantee each defendant a perfect trial with optimally proficient counsel, but rather to guarantee each defendant a fair trial, with constitutionally competent counsel. In order to assess an ineffectiveness claim properly, the court 'must consider the totality of the evidence before the judge or jury." ' *Marshall v. Hendricks,* 307 F.3d 36, 85 (3d Cir.2002)(quoting *Strickland,* 466 U.S. at 695).

**3. Delaware Supreme Court's Application of *Strickland***

In the present case, the Delaware Supreme Court found that even if the tardy appointment of Levinson was objectively unreasonable, petitioner failed to demonstrate the presence of actual prejudice. [FN10] Petitioner asserts that the prejudice which resulted was the failure of trial counsel to obtain independent forensic experts on all physical evidence at trial. Petitioner's claims, however, are not supported by the testimony of trial counsel in post-conviction proceedings. The Superior Court found that both trial counsel testified that they had adequate time to prepare, even if in the ideal and in retrospect, additional time may have been helpful. *Jackson II,* 770 A.2d at 512.

> FN10. The court notes that, although federal statutory law has long provided for two court-appointed attorneys in capital cases, there is not a constitutional right to two attorneys. While it may be Delaware practice to appoint two attorneys

in a capital case, the presence of only one court-appointed attorney does not offend the Sixth Amendment. *See Riley v. Taylor,* 237 F.3d 300 (3d Cir.2001) rev'd on other grounds by 277 F.3d 261, 273 (3d Cir.2001) (en banc); *Bell v. Watkins* 692 F.2d 999, 1009 (5th Cir.1982). *See also United States v. Boone,* 245 F.3d 352 (4th Cir.2001) (discussing 18 U.S.C. § 3005). Consequently, as a second court appointed attorney is not constitutionally required, predicating an ineffective assistance claim on the tardy appointment of a replacement co-counsel is tenuous at best.

Petitioner asserts that additional time would have permitted independent forensic testing and, if such testing were performed and if it were favorable, there would be a reasonable probability that the trial result would have been different. (D.I. 24 at 24) Actual prejudice, however, requires that if independent testing had been performed, there is a reasonable probability that it would have yielded favorable results sufficient to undermining confidence in the verdict. *See Strickland,* 466 U.S. at 694. In the present case, petitioner fails to make such a showing as he has failed to identify additional forensic testing that is actually favorable. [FN11]

> FN11. For example, this court authorized the expenditure of CJA funds for the purpose of retaining a forensic expert, Dr. Jeffrey Hubbard. (D.I.12) Dr. Hubbard submitted an expert report opining on the Girardi autopsy report and trial testimony of Dr. Inguito. Dr. Hubbard criticized the autopsy report for characterizing the cranial-facial wounds as "MULTIPLE BLUNT FORCE INJURIES" rather than as sharp injuries. (D.I. 25 at 132) While the court agrees that a wound created by an ax may be more accurately described as a sharp force injury, Dr. Hubbard's criticism would not likely have been favorable to petitioner with respect to the jury. Dr. Hubbard criticized Dr. Inguito's testimony for opining and speculating on matters outside the knowledge of an autopsy pathologist, such as the intent of the attacker to "silence" the victim. (D.I. 25 at 133)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1192650 (D.Del.)
(Cite as: 2004 WL 1192650 (D.Del.))

The court finds that Dr. Ignuito's testimony may have contained some speculative commentary for which the prosecution did not adequately lay a foundation. (D.I. 25 at 132-33) However, even if petitioner's trial counsel had retained a forensic pathology expert and/or objected to Dr. Inguito's testimony, the central facts surrounding how the murder occurred are uncontroverted: Girardi was struck multiple times to the face with an ax in the driveway of her home. While Dr. Inguito's testimony may have exceeded the scope of his knowledge in certain respects, petitioner's trial counsel may have easily concluded that objecting would only increase the amount of time that the jury heard details of the Girardi murder. As Dr. Inguito's testimony was irrelevant to whether petitioner committed the murder, and the manner in which the murder was committed is uncontroverted, the decision to not retain an independent forensic pathologist was not unreasonable. Consequently, while retaining additional forensic experts is helpful in many cases, the decision to forgo them is not per se unreasonable.

The most substantial physical evidence linking petitioner to the scene was a footprint. The shoe making that footprint was found on petitioner's foot at the time of his arrest. Trial counsel had that footprint independently tested and that expert's findings were not favorable. While petitioner asserts that the expert did not conduct a thorough enough examination of the physical evidence, petitioner fails to show that a more thorough examination would have produced favorable results. As petitioner's argument lacks the requisite showing of actual prejudice, the Delaware Supreme Court's conclusion cannot be said to be objectively unreasonable.

C. Failure to Object to Lachette's Testimony

**\*15** On direct examination, Lachette was asked by the state prosecutor: "What were your thoughts when you and the defendant were talking about doing a burglary, a house burglary?" Lachette responded: "I originally wasn't going to do it. It was something he did, I don't want to say as a habit, but it was something that he often did." *Jackson II,* 770 A.2d at 513. Lachettee's answer was clearly nonresponsive to the prosecutor's question. *Id.* at 513- 14. Petitioner contends that trial counsel's failure to object to Lachette's testimony as inadmissible character evidence and move for a mistrial on that basis was ineffective assistance of counsel. As a result, petitioner contends, he did not receive a fair trial. Petitioner asserts that the Delaware Supreme Court's analysis under *Strickland* as to this claim was objectively unreasonable. This court disagrees.

As discussed above, *Strickland* is a two-prong test requiring a showing of unreasonable conduct by counsel and actual prejudice resulting therefrom. In the present case, the Delaware Supreme Court's findings as to both prongs were reasonable. First, the Delaware Supreme Court found the first prong to be missing because trial counsel's decisions to not object and to not move for a mistrial were reasonable under the circumstances. *Jackson II,* 770 A.2d at 513-14. The Delaware Supreme Court reasoned that the decision to not object and seek a mistrial was strategic and based upon trial counsel's reasonable belief that a mistrial would not be granted. *Id. See, generally, Strickland,* 466 U.S. at 687 (discussing deference to be afforded counsel for strategic decisions).

Further, the Delaware Supreme Court found that the second prong of *Strickland* was not met because plaintiff failed to show actual prejudice. [FN12] *Jackson II,* 770 A.2d at 513. A showing of actual prejudice in this case would require a showing that an objection would likely have resulted in the ordering of a mistrial by the Superior Court. While evidence of petitioner's alleged propensity to commit burglary should have been excluded, where as here, it resulted from nonresponsive testimony and was not further referenced to the jury, it is not probable that a mistrial would have been ordered where at most a curative instruction would have sufficed. Consequently, because the Delaware Supreme Court found the absence of both unreasonable conduct by petitioner's trial counsel and prejudice, the Delaware Supreme Court's denial of petitioner's ineffective assistance of counsel claim was not objectively unreasonable.

> FN12. Petitioner's brief to this court also fails to address actual prejudice. (D.I. 24 at 28-29)

Not Reported in F.Supp.2d                                                                                           Page 14
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

D. Failure to Disclose Impeachment Evidence

Petitioner asserts that the Delaware Supreme Court "erred in essentially conducting a harmless error analysis, and in considering factors that were not before the jury" when analyzing the impact of the State's failure to disclose certain impeachment evidence. [FN13] (D.I. 24 at 39)

> FN13. The court notes that legal error is not a basis for relief under § 2254. Instead, this court can only review for an objectively unreasonable application of federal law which is different from an erroneous or incorrect application. *See Bell,* 535 U.S. at 694.

Where a conviction is challenged on the basis of the state's failure to disclose evidence, the appropriate federal precedent to apply is *Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny. A *Brady* violation consists of three components: (1) the evidence must have exculpatory or impeachment value to the accused; (2) the evidence must be either wilfully or inadvertently suppressed by the accused; and (3) there must be prejudice to the accused. *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999). The most critical component to establish is that of prejudice which requires a materiality inquiry. *Id.* That inquiry asks whether the undisclosed "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley,* 514 U.S. 419, 435 (1995).

**\*16** In the present case, the undisclosed evidence related to an implicit promise to Andre Johnson for leniency in Johnson's unrelated pending criminal proceedings. The value of that evidence to petitioner's defense would have been to further impeach Johnson's credibility as a witness. The substance of Johnson's testimony related to petitioner's efforts to solicit Johnson's participation in a plot to silence Burton, a key witness for the State. Johnson's testimony inferentially corroborated the reliability of Burton's testimony by providing evidence that petitioner sought to prevent Burton from testifying.

The Delaware Supreme Court found "clear record support for the proposition that the State did, implicitly, promise Johnson leniency on the burglary, theft and weapons

charges and ... conclud[ed] that the State should have informed [petitioner's] counsel about that implicit promise." *Jackson II,* 770 A.2d at 514. This implicit promise constituted favorable impeachment evidence, as it tends to show Andre Johnson's bias, and it was not disclosed to petitioner. [FN14] The Delaware Supreme Court then applied the *Kyles'* materiality standard and concluded that the "evidence corroborating Johnson's testimony and the circumstantial evidence supporting [petitioner's] presence at the scene and participation in the crime overwhelms any perceived lack of 'confidence in the outcome of the trail." ' *Jackson II,* 770 A.2d at 517.

> FN14. As the Supreme Court explained in *Strickler v. Greene,* the term "*Brady* violation" is often subject to unartful use. 527 U .S. at 281-82. Frequently, as the Delaware Supreme Court did in this case, courts will refer to all evidence that satisfies the first two components as "*Brady* evidence" without regard to whether evidence satisfies the materiality requirement. Nevertheless, in order for the nondisclosure by the state of exculpatory or impeachment evidence to constitute a violation of *Brady,* that evidence must satisfy the materiality standard described in *Kyles.*

The Delaware Supreme Court's application of *Kyles* was not objectively unreasonable. At trial, Johnson's credibility was raised by petitioner's trial counsel. Johnson's criminal record was raised in cross examination. In particular, the cross examining attorney questioned petitioner on his pending criminal charges and the possibility that he would be charged as an habitual offender. This squarely placed Johnson's motive for testifying before the jury. While the undisclosed evidence may have reinforced trial counsel's impeachment of Johnson, the Delaware Supreme Court reasonably concluded that it would not have placed Johnson's testimony in a new light.

Additionally, even if the jury had been made aware of an implicit offer by the prosecutor, Johnson's statements were strongly corroborated by physical evidence, including a letter sent to Johnson bearing petitioner's fingerprint and the enclosed photograph of Burton and map to Burton's residence. To the extent evidence of Johnson's bias may

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

have informed the jury's decision, the physical evidence strongly supported his credibility.

The Superior Court and the Delaware Supreme Court found that the overwhelming evidence implicated petitioner in the murder, including physical evidence tying petitioner to the scene, testimony of several witnesses concerning petitioner's own inculpatory statements, presence of items stolen from the victim's home found at petitioner's apartment, and a witness who observed petitioner discarding bloody gloves. The Delaware Supreme Court considered the value of the impeachment evidence and determined that, under these circumstances, the undisclosed evidence was not material. *Jackson II,* 770 A.2d at 516-17.

**\*17** Petitioner contends that the Delaware Supreme Court's consideration of two factors in its analysis was improper. First, petitioner contends that the Delaware Supreme Court's consideration of the absence of an alibi defense was improper as violative of petitioner's Fifth Amendment rights. Second, petitioner asserts that the Delaware Supreme Court's consideration of evidence not before the jury was improper, namely, the unfavorable report of petitioner's shoe print forensic expert.

Materiality under *Kyles,* however, is one of reasonable probability. *See, e.g., United States v. Bowie,* 198 F.3d 905, 909-13 (D.C.Cir.1999). This analysis is hypothetical and in light of whole trial record. *See id.* at 912. By considering the fact that petitioner's own forensic expert would not have provided favorable evidence, the Delaware Supreme Court underscored the incontrovertibility of the physical evidence in the case. Put another way, the impeachment of Andre Johnson's testimony may have had greater value if the physical evidence in the case had been challenged or might have been challenged. Similarly, the impeachment of Johnson may have had greater value if it enhanced the likelihood that the jury might believe an alibi defense. *See Bowie,* 198 F.3d at 911. For example, if the jury had to choose between Johnson's testimony and an alternate version of events offered by the defense, evidence of bias may have had a greater impact. Consequently, the Delaware Supreme Court's consideration of these two factors while weighing the potential impact that the undisclosed bias evidence may have had on the jury was not improper.

Accordingly, the court finds that the Delaware Supreme Court's conclusions were neither contrary to nor objectively unreasonable in light of established federal law.

E. Delaware's Statutory Scheme

Petitioner's final grounds for post-conviction relief asserts that Delaware's statutory scheme for the imposition of the death penalty violates the Sixth and Fourteenth Amendments as interpreted by the Supreme Court in *Ring v. Arizona.* 536 U.S. 584 (2002). [FN15] In *Ring,* the United States Supreme Court held that the Sixth Amendment right to a jury trial requires that a jury, not a judge, decide beyond a reasonable doubt the existence of any fact that increases the maximum punishment for first-degree murder from life imprisonment to death. *Ring,* 536 U.S. at 589. For the reasons stated below, the court finds that the rule announced in *Ring* is procedural in nature and, under *Teague v. Lane,* 489 U.S. 288 (1989), should not be retroactively applied to the present case on collateral review.

> FN15. Though decided ten years after petitioner was sentenced to death under the Delaware Death Penalty Statute, petitioner asserts that *Ring* is retroactively applicable to his case because it satisfies the test for retroactivity announced in *Teague v. Lane,* 489 U.S. 288 (1989). Recently, this court has considered and concluded that *Ring* should not be retroactively applied. *See Outten v. Snyder,* Civ. No. 98-785 (D.Del. Mar. 31, 2004) *and Shelton v. Snyder,* Civ. No. 00-78 (D.Del. Mar. 31, 2004).

1. Retroactivity [FN16]

> FN16. The court recognizes that the United States Supreme Court granted certiorari on December 1, 2003 in *Schriro v. Summerlin,* 124 S.Ct. 833 (2003), to address the very issues at bar, namely: (1) whether the rule announced in *Ring* is substantive, rather than procedural, and therefore exempt from *Teague'* s retroactivity analysis; and (2) if the rule is procedural, whether it fits within the "watershed" exception to the general rule of non-retroactivity. Nevertheless, because of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

extended stays already granted in this case, the court has proceeded to judgment.

The initial step in analyzing the retroactivity of a new rule of law is to determine whether the rule is substantive or procedural in nature because " 'the Supreme Court has created separate retroactivity standards for new rules of criminal procedure and new decisions of substantive law." ' *See United States v. Swinton,* 333 F.3d 481, 487 (3d Cir.2003) (quoting *In re Turner,* 267 F.3d 225, 229 (3d Cir.2001) (internal citations omitted)).

**\*18** The distinction between "substantive" and "procedural" is not always easy to discern. Indeed, the Third Circuit has observed that cases in the habeas context in particular do "not fit neatly under either the substantive standard for determining retroactivity or the procedural standard." *United States v. Woods,* 986 F.2d 669, 671 (3d Cir.1993). Despite this difficulty, the Supreme Court has recognized that it is an important distinction in the habeas context because the principal function of habeas relief is to assure that no man is incarcerated under a procedure that creates the risk that an innocent man will be convicted. *Bousley v. United States,* 523 U.S. 614, 620 (1998).

In general, substantive rules determine the meaning of a criminal statute so that conduct that formerly resulted in criminal liability may no longer be illegal. *Id.* The Supreme Court has observed that "decisions of this Court holding that a substantive federal criminal statute does not reach certain conduct, like decisions placing conduct 'beyond the power of the criminal law-making authority to proscribe,' necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal." *Id.* at 620-21. Decisions announcing substantive rules, consequently, often address the criminal significance of certain facts or the underlying prohibited conduct. *See Curtis v. United States,* 294 F.3d 841, 843 (7th Cir.2002).

In contrast, a procedural rule does not interpret the scope of a statute. *Bousley,* 523 U.S. at 621. A procedural rule changes the way a case is adjudicated, not what the government must prove to establish a criminal offense. New procedural rules "recognize[ ] a constitutional right that typically applies to all crimes irrespective of the underlying

conduct, and to all defendants irrespective of their innocence or guilt." *Coleman v. United States,* 329 F.3d 77, 84 (2d Cir.2003). New rules of substantive criminal law, therefore, are presumptively retroactive on habeas review, *id.* at 620, whereas new rules of criminal procedures are presumptively non-retroactive on habeas review. *Teague,* 489 U.S. at 306, 310.

In *Teague,* the Supreme Court announced principles regarding retroactivity in the habeas context for new rules of criminal procedure. [FN17] The Supreme Court explained that because of the interest in finality of judgments in the criminal justice system, a new rule of criminal procedure does not apply retroactively to cases that have become final before the new rule is announced unless the new rule falls within one of two narrow exception categories. *Id.* at 309-10. The Supreme Court specifically recognized that

> FN17. "Although there was no majority opinion in *Teague,* the Supreme Court has since treated Justice O'Connor's plurality opinion as setting forth the holding of the Court." *Coleman,* 329 F.3d at 82 n. 3 (2d Cir.2003) (citing *Tyler v. Cain,* 533 U.S. 656, 665 (2001)).

[a]pplication of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect.... The 'costs imposed upon the State[s] by retroactive application of new rules of constitutional law on habeas corpus ... generally far outweigh the benefits of this application .'
**\*19** *Id.* at 309-310 (quoting *Solem v. Stumes,* 465 U.S. 638, 654 (1994)).

As a result of the interest in finality, a reviewing court must conduct a three-step analysis after finding a new rule procedural in nature to decide whether *Teague* bars retroactive application of the rule. First, the reviewing court "must ascertain the date on which the defendant's conviction and sentence became final." *Caspari v. Bohlen,* 510 U.S. 383, 390 (1994). "Final, in the context of [a] retroactivity analysis, means that a judgment of conviction has been entered, the time for direct appeals from that judgment has

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 17
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

expired, and the time to petition the United States Supreme Court for certiorari has expired." *Diaz v. Scully,* 821 F.2d 153, 156 (2d Cir.1987).

Second, the reviewing court must survey "the legal landscape" as it existed on the date that the defendant's conviction became final and determine if a "court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule ... [already] was required by the Constitution." *Caspari,* 510 U.S. at 390. That is, "a case announces a new rule [of criminal procedure] when it breaks new ground or imposes a new obligation on the [s]tates or the [f]ederal [g]overnment. To put it differently, a case announces a new rule [of criminal procedure] if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Teague,* 489 U.S. at 301 (citations omitted). If existing precedent already required application of the rule, then the *Teague* retroactivity bar does not apply.

If the procedure at issue is considered new for *Teague* purposes, however, then the court must proceed to the third step of the analysis and determine whether an exception applies. To this end, a new rule of criminal procedure will apply retroactively if it either (1) "places certain kinds of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe;" or (2) "requires the observance of those procedures that are implicit in the concept of ordered liberty." *Id.* at 311 (internal quotations omitted).

The first exception overcomes the presumption against retroactivity only if the new rule "places a class of private conduct beyond the power of the State to proscribe or addresses a 'substantive categorical guarante[e] accorded by the Constitution,' such as a rule 'prohibiting a certain category of punishment for a class of defendants because of their status or offense.' " *Saffle v. United States,* 494 U.S. 484, 494 (2000) (internal citations and quotations omitted). The second exception is reserved for "watershed rules of criminal procedure." *Teague,* 481 U.S. at 311. Such rules are those in which (1) a failure to adopt the new rule "creates an impermissibly large risk that the innocent will be convicted," and (2) "the procedure at issue ... implicates the

fundamental fairness of the trial." *Id.* at 312. Following the *Teague* decision, the Supreme Court explained in *Sawyer v. Smith,* 497 U.S. 227, 242 (1990) (citing *Teague,* 489 U.S. at 311), that

> **\*20** [i]t is thus not enough under *Teague* to say that a new rule is aimed at improving the accuracy of trial. More is required. A rule that qualifies under this exception must not only improve accuracy, but also "alter our understanding of the bedrock procedural elements" essential to the fairness of a proceeding.

In light of this explanation, watershed rules overcome the presumption against retroactivity only if they "improve accuracy [of trial]" and "alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." ' *Sawyer,* 497 U.S. at 242.

2. *Ring v. Arizona:* A New Rule of Criminal Procedure

Having defined the analytical framework for a retroactivity analysis, the court must consider whether *Ring* announced a substantive rule or a procedural rule as to Delaware criminal law. If *Ring* only stands for the proposition that every element of a crime must be submitted to a jury, then it could be characterized as a pure procedural rule that extends *Apprendi v. New Jersey,* 530 U.S. 466 (2000), in the context of a capital crime. If, on the other hand, *Ring* is construed to define the offense of capital murder under Delaware law, then it may be regarded as a substantive decision.

In *Apprendi,* the defendant fired several bullets into the home of an African American family that had recently moved into a previously all-white New Jersey neighborhood. The defendant pled guilty to possession of a firearm for an unlawful purpose, a crime that New Jersey's substantive criminal statute designated as a second-degree offense punishable under New Jersey's felony sentencing statute by a five to ten year prison term. The trial judge enhanced the defendant's sentence to twelve years pursuant to the New Jersey hate crime law after finding that the defendant's underlying crimes were motivated by racial bias. [FN18] *Id.* at 469-70.

> FN18. Under the New Jersey hate crime law, a trial judge may extend the term of imprisonment if he finds by a preponderance of the evidence that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

defendant acted purposefully to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation, or ethnicity.

The defendant challenged the constitutionality of New Jersey's hate crime statute, arguing that the Due Process Clause "requires that the finding of bias upon which [the] hate crime sentence was based must be proved to a jury beyond a reasonable doubt." *Id.* at 471. The United States Supreme Court agreed with the defendant and held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. The Supreme Court commented that it is immaterial whether the required fact-finding is labeled an "element" or a "sentencing factor." Rather, the Supreme Court explained that "the relevant inquiry is not one of form, but of effect--does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id.* at 494. The Supreme Court also expressly declared that its decision did not impact substantive New Jersey criminal law, stating "the substantive basis for New Jersey's enhancement is not at issue; the adequacy of New Jersey's procedure is." *Id.* at 475.

**\*21** In *Ring,* the defendant participated in an armed robbery of a Wells Fargo armored van. The van driver was killed by a single gunshot to the head during the course of the robbery. The jury found the defendant guilty of felony-murder as opposed to premeditated murder. Based solely on this jury verdict, the maximum punishment he could have received under Arizona law was life imprisonment. Nevertheless, the defendant was eligible for the death penalty if he was the victim's actual killer or if he was "a major participant in the armed robbery that led to the killing and exhibited a reckless disregard or indifference for human life." *See Enmund v. Florida,* 458 U.S. 782 (1982) (holding that the Eighth Amendment permits execution of a felony-murder defendant who killed or attempted to kill); *see also Tison v. Arizona,* 481 U.S. 137, 158 (1987) (holding that the Eighth Amendment also permits execution of felony-murder defendant, who did not kill or attempt to

kill, but who was a "major participant in the felony committed" and who demonstrated "reckless indifference to human life"). Citing accomplice testimony at the sentencing hearing, the judge found both that the defendant was the actual killer and that he was a major participant in the armed robbery. The judge also found two aggravating factors and one non-statutory mitigating factor. The judge concluded that the mitigating circumstance did not "call for leniency" and, thus, sentenced the defendant to death. [FN19]

> FN19. Under Arizona law, first-degree murder is punishable by death or life imprisonment. *See Ring,* 536 U.S. at 592 (citing Ariz.Rev.Stat. Ann. 13-1105(c) (2001)). The trial judge is to conduct a separate hearing to determine the existence or non-existence of certain enumerated circumstances to determine the sentence to impose. *Id.* (citing Ariz.Rev.Stat. Ann. 13-703 (2001)). The statute also instructs that "[t]he hearing shall be conducted before the court alone. The court alone shall make all factual determinations required by this section or the constitution of the United States or this state." *Id.* (quoting Ariz.Rev.Stat. Ann. 13-703 (2001)).

The defendant appealed his sentence, arguing that Arizona's capital sentencing scheme violated the Sixth and Fourteenth Amendments because it required a judge to find the facts particular to raising the maximum penalty for a crime. The Supreme Court concluded that, "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." *Ring,* 536 U.S. at 609 (citing *Apprendi,* 530 U.S. at 494, n. 19). The Supreme Court observed that "[t]he right to trial by jury would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death." [FN20] *Ring,* 536 U.S. at 609. Accordingly, the Supreme Court held that "[c]apital defendants, no less than noncapital defendants, ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 589. [FN21]

> FN20. Justice Stevens' dissent in *Walton v.*

Not Reported in F.Supp.2d                                                                           Page 19
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

*Arizona,* 497 U.S. 639 (1990), foreshadows this observation. Justice Stevens argued that "Arizona's aggravating circumstances ... operate as statutory 'elements' of capital murder under Arizona law because in their absence, that sentence is unavailable." *Id.* at 709 & n. 1. Justice Stevens further contended that "findings of factual elements necessary to establish a capital offense" must be determined by a jury rather than a judge. *Id.* at 710-14.

FN21. In reaching this holding, the Supreme Court expressly overruled *Walton,* a decision that upheld Arizona's capital sentencing structure under which a judge, rather than a jury, determined whether the prosecution had established an aggravating factor necessary to subject the defendant to the death penalty.

After careful review of both *Apprendi* and *Ring,* the court agrees with the Tenth and Eleventh Circuits and various state appellate courts that *Ring* is an extension of *Apprendi.* [FN22] That is, *Apprendi* dictates the type of fact-finding process that must be employed in a criminal sentencing hearing. *Ring* applies *Apprendi* to capital crimes, prescribing what fact-finding process must be in employed in a capital sentencing hearing. Because the Third Circuit and every other federal appellate court that has considered whether *Apprendi* created a substantive or a procedural rule has found it to be procedural, the court is compelled to follow this precedent and find that *Ring* likewise is procedural. *See United States v. Jenkins,* 333 F.3d 151, 154 (3d 2003); *Swinton,* 333 F .3d at 489 (3d Cir.2003). *See also Sepulveda v. United States,* 330 F.3d 55, 62-63 (1st Cir.2003); *Coleman,* 329 F.3d at 83-88 (2d Cir.2003); *United States v. Sanders,* 247 F.3d 139, 147-48 (4th Cir.2001); *United States v. Brown,* 305 F.3d 304, 307-09 (5th Cir.2002); *Curtis,* 294 F.3d at 842-44 (7th Cir.2002); *Cannon,* 297 F.3d at 994 (10th Cir.2002). The court notes that this finding aligns with the decisions of three federal appellate courts that have considered the substantive/procedural question for *Ring. See Turner,* 339 F.3d at 1284; *Cannon,* 297 F.3d at 994; *In re Johnson,* 334 F.3d 403, 405 n. 1 (5th Cir.2003) (dicta); *see also*

*Summerlin v. Stewart,* 341 F.3d 1082, 1101 (9th Cir.2003) (holding *Ring* to announce a procedural rule in part). Accordingly, the court will analyze *Ring* under *Teague* to ascertain whether *Ring* should be retroactively applied on collateral review.

FN22. *See Turner v. Crosby,* 339 F.3d 1247, 1284 (11th Cir.2003); *Cannon v. Mullin,* 297 F.3d 989, 994 (10th Cir.2002); *Woldt v. People,* 64 P.3d 256, 266 (Colo.2003); *Wright v. State,* 857 So.2d 861, 877-78 (Fla.2003); *Leone v. State,* 797 N.E.2d 743, 750 (Ind.2003); *State v. Whitfield,* 107 S.W.3d 253, 257 (Mo.2003); *Colwell v. State,* 59 P.3d 463, 469 (Nev.2002); *Colwell v. Nevada,* 124 S.Ct. 462 (2003); *Murphy v. State,* 54 P.3d 556, 566 (Okla.Crim.App.2002).

a. Analysis of *Ring v. Arizona* Under *Teague v. Lane*

**\*22** As the first step in a *Teague* analysis, the court must ascertain the date that petitioner's conviction became final. The United States Supreme Court denied petitioner's application for a writ of certiorari on April 15, 1997. *Jackson v. Delaware,* 520 U .S. 1171 (1997) There relevant date for this analysis, therefore, is April 15, 1997.

Next, the court must survey "the legal landscape" as it existed on April 15, 1997 to determine whether the result in *Ring* was dictated by then-existing precedent. Under the capital sentencing scheme for first-degree murder contained within the Delaware Death Penalty Statute in effect throughout 1997, a sentence of death could be imposed only under the bifurcated procedure prescribed by 11 Del. C. § 4209. *Hameen v. State,* 212 F.3d 226, 231-32 (3d Cir.2000) (quoting *Wright v. State,* 633 A.2d 329, 335 (Del.1993)). "Any person convicted of first-degree murder shall be punished by death or by imprisonment for the remainder of his or her natural life without benefit of probation or parole or any other reduction." 11 Del. C. § 4209(a) (1991).

Under § 4209(b), a hearing had to be conducted on the issue of punishment to determine the precise sentence. If the defendant was convicted of first-degree murder by a jury, then the jury was required to recommend answers to the following questions:

Not Reported in F.Supp.2d                                                                    Page 20
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

(1) [w]hether the evidence show[ed] beyond a reasonable doubt the existence of at least [one] aggravating circumstance as enumerated in subsection (e) of this section; [FN23] and

> FN23. Section 4209(e)(1) provided for twenty-two possible aggravators: (a) The murder was committed by a person in, or who has escaped from, the custody of a law-enforcement officer or place of confinement; (b) The murder was committed for the purpose of avoiding or preventing an arrest or for the purpose of effecting an escape from custody; (c) The murder was committed against any law-enforcement officer, corrections employee or firefighter, while such victim was engaged in the performance of official duties; (d) The murder was committed against a judicial officer, a former judicial officer, Attorney General, former Attorney General, Assistant or Deputy Attorney General or former Assistant or Deputy Attorney General, State Detective or former State Detective, Special Investigator or former Special Investigator, during, or because of, the exercise of an official duty; (e) The murder was committed against a person who was held or otherwise detained as a shield or hostage; (f) The murder was committed against a person who was held or detained by the defendant for ransom or reward; (g) The murder was committed against a person who was a witness to a crime and who was killed for the purpose of preventing the witness's appearance or testimony in any grand jury, criminal or civil proceeding involving such crime, or in retaliation for the witness's appearance or testimony in any grand jury, criminal or civil proceeding involving such crime; (h) The defendant paid or was paid by another person or had agreed to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim; (i) The defendant was previously convicted of another murder or manslaughter or of a felony involving the use of, or threat of, force or violence upon another person; (j) The murder was committed while the defendant was engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit any degree of rape, unlawful sexual intercourse, arson, kidnapping, robbery, sodomy or burglary; (k) The defendant's course of conduct resulted in the deaths of [two] or more persons where the deaths are a probable consequence of the defendant's conduct; (l) The murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, use of an explosive device or poison or the defendant used such means on the victim prior to murdering the victim; (m) The defendant caused or directed another to commit murder or committed murder as an agent or employee of another person; (n) The defendant was under a sentence of life imprisonment, whether for natural life or otherwise, at the time of the commission of the murder; (o) The murder was committed for pecuniary gain; (p) The victim was pregnant; (q) The victim was severely handicapped or severely disabled; (r) The victim was [sixty-two] years of age or older; (s) The victim was a child [fourteen] years of age or younger, and the murder was committed by an individual who is at least [four] years older than the victim; (t) At the time of the killing, the victim was or had been a non-governmental informant or had otherwise provided any investigative, law enforcement or police agency with information concerning criminal activity, and the killing was in retaliation for the victim's activities as a non-governmental informant or in providing information concerning criminal activity to an investigative, law enforcement or police agency; (u) The murder was premeditated and the result of substantial planning; and (v) The murder was committed for the purpose of interfering with the victim's free exercise or enjoyment of any right, privilege or immunity protected by the First Amendment to the United States Constitution, or because the victim has exercised or enjoyed said rights, or because of the victim's race, religion, color, disability, national origin or ancestry.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 21
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

(2) [w]hether, by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which [bore] upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, the aggravating circumstances found to exist outweigh[ed] the mitigating circumstances found to exist.

11 Del. C. § 4209(c)(3). The trial court, after considering the recommendation of the jury as to both questions, was required to decide the same questions. 11 Del. C. § 4209(d). If the court answered both questions in the affirmative, then it had to impose a sentence of death; otherwise, it had to impose a sentence of life imprisonment without the possibility of probation, parole, or other reduction in sentence. *Id.* "Thus, the Superior Court [bore] the ultimate responsibility for imposition of the death sentence [under the Delaware Death Penalty Statute] while the jury act[ed] in an advisory capacity 'as the conscience of the community.' " *Hameen,* 212 F.3d at 232 (quoting *State v. Cohen,* 604 A.2d 846, 856 (Del.Super.1992)).

Following careful review of the provisions of the Delaware Death Penalty Statute, there is no doubt that *Ring* positively announced a new rule of criminal procedure not dictated by precedent as it existed in 1997. That is, the Delaware Death Penalty Statute did not require the jury to act as the final decision-maker concerning the existence of aggravating circumstances. The court, therefore, must proceed to the third step in the analysis, namely, whether either one of the two *Teague* exceptions apply to the facts at bar.

b. Retroactive Bar Exceptions

**\*23** The first category of rules excepted from *Teague'* s retroactivity bar is that which places "certain kinds of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe." *Teague,* 489 U.S. at 307. *Ring* clearly does not avail this exception. *See Turner,* 339 F.3d at 1285 (holding that *Ring* does not implicate the first *Teague* exception). Just as numerous courts have recognized that *Apprendi* did "not decriminalize any class of conduct or prohibit a certain category of punishment for a class of defendants," *Ring* likewise did not decriminalize first-degree murder or prohibit the state from punishing first-degree murder. *See, e.g., Jones v. Smith,* 231

F.3d 1227, 1237 (9th Cir.2000) (holding that "the first exception identified in *Teague* is plainly inapplicable here, where the state's authority to punish petitioner for attempted murder is beyond question"); *United States v. Sanders,* 247 F.3d 139, 148 (4th Cir.2001) (holding that "the first exception clearly does not apply here because *Apprendi* did not place drug conspiracies beyond the scope of the state's authority to proscribe").

The second category of rules excepted from *Teague'* s retroactivity bar is that which "requires the observance of those procedures that are implicit in the concept of ordered liberty." *Teague,* 489 U.S. at 307. "This exception is a narrow one, and its narrowness is consistent with the recognition underlying *Teague* that retroactivity 'seriously undermines the principle of finality which is essential to the operation of our criminal justice system." ' *Spaziano v. Singletary,* 36 F.3d 1028, 1042-43 (11th Cir.1994) (quoting *Teague,* 489 U.S. at 309). The Supreme Court has emphasized the narrowness of this second exception by using as a prototype the rule of *Gideon v. Wainwright,* 372 U.S. 335 (1963), [FN24] and by noting that "we believe it unlikely that many such components of basic due process have yet to emerge." *Teague,* 489 U.S. at 313; *see also Saffle,* 494 U.S. at 495; *Butler v. McKellar,* 494 U.S. 407, 415 (1990); *O'Dell v.. Netherland,* 521 U.S. 151, 170 (1997). The Court has further underscored the narrowness of the second *Teague* exception by its actions. Beginning with *Teague* in 1989, the Court has examined numerous new rules of law against the second exception and found that none of them fit within its narrow confines. *See, e.g., Teague,* 489 U.S. at 307; *Caspari,* 510 U.S. at 396; *Graham v. Collins,* 506 U.S. 461, 478 (1993); *Sawyer,* 497 U.S. at 242; *Saffle,* 494 U.S. at 495; *Butler,* 494 U.S. at 416.

> FN24. In *Gideon v. Wainwright,* 372 U.S. 335 (1963), the Supreme Court held that the right of an indigent defendant in a criminal trial to have the assistance of counsel is a fundamental right essential to a fair trial. This decision dramatically changed American criminal procedure by requiring states to provide counsel in all criminal trials involving serious offenses.

Mindful of the narrow confines of the second *Teague*

exception, the court finds that *Ring* neither improves accuracy of trial nor alters our understanding of the bedrock procedural elements essential to the fairness of a proceeding. *Ring* merely shifted the ultimate fact-finding responsibility as to existence of aggravating circumstances in the capital crime context from the judge to the jury. This shift does not enhance the likelihood of an accurate sentencing result. Indeed, the Supreme Court has recognized that judges are unbiased and honest. *See Withrow v. Larkin,* 421 U.S. 35, 47 (1975). Additionally, the Delaware Death Penalty Statute required a two-phase approach wherein the jury offered a recommendation to the judge as to both the aggravating factors and the sentence. The jury's recommendation likely served as a check for the judge, thereby lending somewhat of a safeguard to the sentencing process. Furthermore, accuracy is not readily measurable with respect to the existence of aggravating circumstances. The Delaware Death Penalty Statute provided for some aggravators that may be characterized as objective, like those implicated in the facts at bar, and others that very clearly are subjective, such as whether "the murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, use of an explosive device or poison or the defendant used such means on the victim prior to murdering the victim" and whether "the murder was premeditated and the result of substantial planning." *See* 11 Del. C. § 4209(e)(1)(l) and (u). While a reviewing court could attempt to measure the accurate determination of the objective aggravators, there would be no way for a reviewing court to measure the accurate determination of the subjective aggravators. The court, therefore, concludes that petitioner cannot meet the first requirement necessary to avail the second *Teague* exception.

**\*24** Turning to consider the second requirement, every federal appellate court that has considered *Apprendi* under *Teague'* s second exception has concluded that it did not represent a watershed rule of criminal procedure. [FN25] While the court recognizes that the nature of the crimes underlying the *Apprendi* and *Ring* decisions differ, the court, nonetheless, finds that *Ring,* as an extension of *Apprendi,* is not a watershed rule. The court notes that select appellate courts have reached the same conclusion. [FN26] Unlike the Supreme Court prototype case, *Gideon,* where

the fundamental fairness of an indigent's trial was necessarily impacted by whether he was able to avail the assistance of counsel, *Ring* does not implicate the same fairness concerns. That is, there is no reason to believe that an impartial jury would reach a more accurate conclusion regarding the presence of aggravating circumstances than an impartial judge. Indeed, the Supreme Court explained in *Ring* that "the Sixth Amendment jury trial right ... does not turn on the relative rationality, fairness, or efficiency of potential factfinders." *Ring,* 536 U.S. at 607.

FN25. *See Sepulveda,* 330 F.3d at 59-63 (1st Cir.2003); *Coleman,* 329 F.3d at 88-90 (2d Cir.2003); *Swinton,* 333 F.3d 481, 489-91 (3d Cir.2003); *Sanders,* 247 F.3d at 148-51 (4th Cir .); *United States v. Brown,* 305 F.3d 304, 309-10 (5th Cir.2002); *Regalado v. United States,* 334 F.3d 520, 526-27 (6th Cir.2003); *Curtis,* 294 F.3d at 843-44 (7th Cir.2002); *United States v. Moss,* 252 F.3d 993, 998-1001 (8th Cir.2001); *United States v. Sanchez-Cervantes,* 282 F.3d 664, 669-70 (9th Cir.2002); *United States v. Mora,* 293 F.3d 1213, 1218-19 (10th Cir.); *McCoy v. United States,* 266 F.3d 1254, 1255-58 & n. 16 (11th Cir.2001). Several state appellate courts have also held that *Apprendi* did not announce a watershed rule. *See People v. Bradbury,* 68 P.3d 494, 496-97 (Colo.App.2002); *Figarola v. State,* 841 So.2d 576, 577 (Fla.App.2003); *People v. Gholston,* 772 N.E.2d 880, 886-88 (Ill.App.2002); *Whisler v. State,* 36 P.3d 290, 300 (Kan.2001); *Meemken v. State,* 662 N.W.2d 146, 149-50 (Minn.App.2003); *Teague v. Palmateer,* 57 P.3d 176, 183-87 (Ore.App.2002).

FN26. *See Turner,* 339 F.3d at 1285-86 (11th Cir.2003); *Head v. Hill,* 587 S.E.2d 613, 619 (Ga.2003); *State v. Lotter,* 664 N.W.2d 892, 905-08 (Neb.2003); *Colwell,* 59 P.3d at 473 (Nev.2002); *State v. Towery,* 64 P.3d 828 (Ariz.2003).

Moreover, Supreme Court precedent substantiates the conclusion that *Ring* does not constitute a watershed rule. The Supreme Court declined to make *Duncan v. Louisiana,*

Not Reported in F.Supp.2d
2004 WL 1192650 (D.Del.)
(Cite as: 2004 WL 1192650 (D.Del.))

Page 23

391 U.S. 145 (1968), which applied the Sixth Amendment's jury trial guarantee to the states through the Fourteenth Amendment, retroactive. *DeStefano v. Woods,* 392 U.S. 631, 633 (1968). The Supreme Court held that Duncan "should receive only prospective application." *Id.* Even though the *DeStefano* decision preceded *Teague,* the Supreme Court's reasoning is still relevant. The Supreme Court stated, "We would not assert, however, that every criminal trial--or any particular trial--held before a judge alone is unfair or that a defendant may never be as fairly treated by a judge as he would be by a jury." *Id.* at 634-35 (quoting *Duncan,* 391 U.S. at 158). For these reasons, the court concludes that *Ring* fails to meet the second requirement of the second *Teague* exception. Accordingly, the court holds that the new rule of criminal procedure embodied in *Ring* does not apply retroactively on collateral review. [FN27]

> FN27. In her dissent in *Ring,* Justice O'Connor observed that prisoners "will be barred from taking advantage of [*Ring'* s] holding on federal collateral review." *Ring,* 536 U.S. at 621 (citing 28 U.S.C. 22449b)(2)(A), 2254(d)(1) and *Teague,* 489 U.S. 288)).

### 3. In the Alternative, Harmless Error

In the event the Supreme Court finds, as did the Ninth Circuit Court in *Summerlin,* that *Ring* should be applied retroactively, the court finds that the error, as applied to petitioner, is harmless. "[T]he United States long ago through its Congress established for its courts the rule that judgments shall not be reversed for 'errors or defects which do not affect the substantial rights of the parties.' " *Chapman v. California,* 386 U.S. 18, 22 (1967).

In *Chapman,* the Supreme Court found that there are "some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring automatic reversal." *Id.* In so holding, the Supreme Court presented a two-step analysis for an appellate court dealing with a constitutional error to use on direct review.

*25 First, the court must determine if the error falls into the category of violations subject to the federal harmless constitutional error rule or if the error instead falls into the category of errors requiring automatic reversal. Second, if the federal harmless constitutional error rule is applicable, then the court must determine the impact of the error under this rule. To this end, the Supreme Court held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 23.

In *Arizona v. Fulminante,* 499 U.S. 279, 310 (1991), the Supreme Court characterized those errors placed in the automatic reversal category as involving "structural defect[s] affecting the framework within which the trial proceeds rather than simply an error in the trial process itself." Structural defects are "defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Id.* at 309. In contrast, a trial error is an "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Id.* at 307-08. The Supreme Court has observed that structural errors have been found in a "very limited class of cases." *See Johnson v. United States,* 520 U.S. 461 (1997) (citing structural errors for: (1) *Gideon* (a total deprivation of the right to counsel); (2) *Tumey v. Ohio,* 273 U.S. 510 (1927) (lack of an impartial trial judge); (3) *Vasquez v. Hillery,* 474 U.S. 254 (1986) (unlawful exclusion of grand jurors on the basis of race); (4) *McKaskle v. Wiggins,* 465 U.S. 168 (1984) (denial of the right to self-representation at trial); (5) *Waller v. Georgia,* 467 U.S. 39 (1984)(denial of the right to a public trial); and (6) *Sullivan v. Louisiana,* 508 U.S. 275 (1993) (an erroneous reasonable doubt instruction to the jury)).

Since *Chapman,* the Supreme Court has ruled that the "harmless beyond a reasonable doubt" standard is not applicable in the context of habeas corpus proceedings, as contrasted with direct review. *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993). In its place, the Supreme Court adopted the standard announced in *Kotteakos v. United States,* 328 U.S. 750 (1946), which focuses on whether the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Kotteakos,* 328 U.S. at 776). Under this standard, a habeas petitioner may obtain collateral review of his constitutional claims, but is not entitled to habeas relief based on trial error unless he can establish that it resulted in "actual prejudice." *Brecht,* 328 U.S. at 637 (citing *United States v. Lane,* 474 U .S. 438, 449 (1986)). The Court reasoned that

> [o]verturning final and presumptively correct convictions on collateral review because the State cannot prove that an error is harmless under *Chapman* undermines the States' interest in finality and infringes upon their sovereignty over criminal matters. Moreover, granting habeas relief merely because there is a " 'reasonable possibility" ' that trial error contributed to the verdict, ... is at odds with the historic meaning of habeas corpus--to afford relief to those whom society has "grievously wronged." Retrying defendants whose convictions are set aside also imposes significant "social costs," including the expenditure of additional time and resources for all the parties involved, the "erosion of memory" and "dispersion of witnesses" that accompany the passage of time and make obtaining convictions on retrial more difficult, and the frustration of "society's interest in the prompt administration of justice."

**\*26** *Brecht,* 507 U.S. at 637 (internal citations and quotations omitted).

As the first step in a *Chapman* analysis, the court finds evident, from a comparison of the constitutional violations held subject to harmless error with those held subject to automatic reversal, that the instant *Ring* error fits in the former category. Unlike a defect such as the complete deprivation of counsel or trial before a biased judge, a *Ring* error does not affect the framework within which the trial proceeds, but rather only the trial process itself. Indeed, the Supreme Court observed that "while there are some errors to which *Chapman* does not apply, they are the exception and not the rule.... [I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." *Rose v. Clark,* 478 U.S. 570, 578 (1986).

Moreover, a *Ring* error is similar in both degree and kind to a failure to submit an element of a crime to the jury. The Supreme Court has considered this type of error under the harmless error standard. In *Johnson,* the trial judge decided the issue of materiality in a perjury prosecution, rather than submit this element to the jury. The Supreme Court recognized that improperly omitting an element from the jury can "easily be analogized to improperly instructing the jury on an element of the offense, an error which is subject to the harmless error analysis." *Johnson,* 520 U.S. at 469. Similarly, in *Neder v. United States,* 527 U.S. 1 (1999), the defendant was prosecuted for tax fraud, mail fraud, bank fraud, and wire fraud. The trial court instructed the jury that it need not consider the materiality of any false statement, even though materiality is an element of both tax fraud and bank fraud. The Supreme Court recognized that the judge's failure to instruct and submit the element of materiality to the jury violated the Sixth Amendment. *Id.* at 9. Nevertheless, the Supreme Court held that the error did not result in a structural error subject to automatic reversal because it did "not necessarily render [the] criminal trial fundamentally unfair." *Id.*

Under a harmless error analysis in the context of a habeas proceeding, the court finds that petitioner cannot establish actual prejudice to satisfy *Brecht.* This conclusion is also consistent with the Delaware Supreme Court analysis of the 1991 Death Penalty statutory scheme. *See Brice v. State,* 815 A.2d 314 (2003). As discussed above, when considering prejudice under the procedural bar doctrine, the judge could not have reached a different conclusion than the jury regarding the existence of the aggravating circumstances beyond a reasonable doubt because the particular aggravators at bar are of an objective nature. *See infra,* Section IV, C, 1.

Petitioner also asserts that the 1991 statute runs afoul of the Supreme Court's decision in *Caldwell v. Mississippi,* 472 U.S. 320 (1985). This is, according to petitioner, because the 1993 jury was not informed that its finding of guilt as to the felony murder charge would establish petitioner's guilt for the death penalty. Petitioner's argument is without merit. In *Caldwell,* the Court found error in the court's and the prosecution's misleading statements to the jury. *Caldwell,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 25
2004 WL 1192650 (D.Del.)
**(Cite as: 2004 WL 1192650 (D.Del.))**

472 U.S. at 340. *See Romano v. Oklahoma,* 512 U.S. 1, 9 (1994). In the present case, the jury instructions were wholly consistent with the law of Delaware and the United States as it existed at the time. Petitioner can not assert a *Caldwell* error based upon law which did not yet exist.

**\*27** Therefore, the court concludes that the *Ring* error at bar was harmless and that petitioner is not entitled to have his case remanded to the state for a re-sentencing hearing. [FN28]

> FN28. Justice O'Connor opined in her dissent in *Ring* that "prisoners will be unable to satisfy the standards of harmless error or plain error review." *Ring,* 536 U.S. at 621.

V. CONCLUSION

For the reasons stated, the court denies petitioner's third amended application for writ of habeas corpus. A certificate of probable excuse for an appeal is ordered, and the stay of execution imposed by this court on August 21, 2001 will be continued pending appellate review by the Court of Appeals for the Third Circuit. An order shall issue.

ORDER

At Wilmington, this 20th day of May 2004, consistent with the opinion issued this same day;

IT IS ORDERED that:

1. Petitioner's application for habeas corpus is denied.

2. A certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2) is granted, the court finding that this is a capital case under 11 Del. C. § 4202 and that there are ambiguities in the application of *Ring v. Arizona,* 536 U.S. 584 (2002), to the facts at bar.

3. The stay of execution imposed by this court on August 21, 2001 is continued pending appellate review by the Court of Appeals for the Third Circuit.

2004 WL 1192650 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:01CV00552 (Docket) (Aug. 13, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.