CondenseIt™

### Page 1

```
 1    IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
           IN AND FOR NEW CASTLE COUNTY
 2
      STATE OF DELAWARE,        )
 3                              )
          VS.                   )  9703008109
 4                              )
      CURTIS McALLISTER,        )
 5        Defendant.            )
                                )
 6

 7

 8
      BEFORE:
 9        HON. CHARLES H. TOLIVER, IV, J.

10
      APPEARANCES:
11        CYNTHIA R. KELSEY, ESQ.
          DEPUTY ATTORNEY GENERAL
12        For the State

13        JOSEPH A. HURLEY, ESQ.
          ATTORNEY AT LAW
14        For the Defendant

15
               - - - - - -
16
          Suppression Hearing
17           May 6, 1998

18

19

20        OFFICIAL COURT REPORTERS
      SUPERIOR COURT OF THE STATE OF DELAWARE
20        DANIEL L. HERRMANN COURTHOUSE
21        WILMINGTON, DELAWARE   19801
             (302) 577-2400 EXT. 422
22

23
```

FILED

AUG 11 2005

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

### Page 2

```
 1              STATE'S EVIDENCE

 2
                    DIR.  CROSS  REDIR.  RECROSS
 3
 4    Gregory Morehart     9    37     69

 5
 6              DEFENSE EVIDENCE

 7
                    DIR.  CROSS  REDIR.  RECROSS
 8
 9    Mark Horton         72    84

10    Rita Chiappardi     87

11    Terr. Whiteside     90

12    Thomas Scully       95   102

13    Curtis McAllister  104   107    109

14

15              INDEX TO EXHIBITS

16

17    State's Exhibit                  Page #

18    1      Checklist                   18

19

20    Defense Exhibit

21    1      Procedure 7.18              56

22    2      Procedure 7.19              69

23
```

### Page 3

```
 1                   May 6, 1998
 2                   9:40 o'clock a.m.
 3                   Courtroom 204
 4    PRESENT:
 5        As noted.
 6        MS. KELSEY: I'm sorry, Your Honor. I decided
 7    I needed a copy of this.
 8        THE COURT: Mr. Hurley -- wait a minute. I
 9    see what you're talking about.
10        MR. HURLEY: To save you some time, I'm
11    prepared to file an amended motion to suppress evidence
12    this morning that I gave to the Court, and the
13    underlying portions indicate the difference between the
14    first and simply goes by greater degree of specificity
15    so the State is on notice what it has to contend with.
16        THE COURT: What was found, Mr. Hurley?
17        MR. HURLEY: Money, drugs, paraphernalia,
18    money.
19        THE COURT: How much money, quantity of drugs?
20        MR. HURLEY: $589. I will make an opening
21    statement when it is appropriate to do so.
22        THE COURT: How much in the way of weight of
23    drugs was found?
```

### Page 4

```
 1        MR. HURLEY: How much quantity? A lot.
 2        THE COURT: Quantify, please.
 3        MR. HURLEY: Can't off the top of my head. I
 4    don't want to mislead you. I don't remember the precise
 5    quantity. I don't have the toxicology report I don't
 6    think.
 7        THE COURT: Do you know, Ms. Kelsey?
 8        MS. KELSEY: Your Honor, the police weight was
 9    ten grams of cocaine and 65 grams of heroin, but there
10    is a toxicology report which I was not planning to have
11    to produce. Here it is.
12        THE COURT: I was just curious.
13        MS. KELSEY: It is 71 grams of heroin and as
14    it turns out there is no cocaine. That was a
15    noncontrolled substance.
16        MR. HURLEY: I would like the State at some
17    point to give me that since discovery is supposed to
18    have been completed by now. I don't have it.
19        MS. KELSEY: Had I known Mr. Hurley did not
20    have it, I would have certainly given it to him. This
21    is my own copy.
22        THE COURT: You can give him a copy today.
23        MS. KELSEY: But I will give it to him before
```

Ex - 1

Page 45

1 why he took his valuable time periodically to give you a
2 call and give you information?
3     A  Well, like I said, without getting into
4 specifics as to that individual, it's something that
5 they wanted to relay to me that they thought was
6 reasonable information.
7     Q  I understand that.  Did he ever express to you
8 what his motivation was in wanting to relay information
9 to you?
10    A  Obviously, if I tell you what that was, I
11 might as well tell you the whole nine -- if you're
12 requesting me to give that information, then I'm going
13 to be saying specifically who the person is.
14    Q  Was he a person that you supervised as a
15 probationer?
16    A  No.
17    Q  Was he a person that you knew to have a
18 criminal record?
19    A  That I'm not certain of.
20    Q  This confidential informant calls you and
21 tells you that -- I'm not clear on what he saw and what
22 this person said that he saw.  Could you go over that
23 again slowly?

Page 46

1     A  With the person, as I had stated in my report,
2 he had been in that home on the evening before, which
3 was Thursday, had seen what I guess you could say was
4 drugs or what they knew to be drugs in the right
5 bedroom.  Next -- there's only two so it's the bedroom
6 next to Norma Johnson's on a bed in a room with a door
7 that was padlocked.
8     Q  Okay.  I'm going to use a designation that I
9 will explain to you so I can be clear on this.  The
10 person who actually saw the drugs on the bed I'm going
11 to refer to as witness.  The person who called you I'm
12 going to refer to as informant, okay?
13        Mr. Informant told you about Mr. Witness'
14 comments to the informant as to what Mr. Witness had
15 seen?
16    A  That's correct.
17    Q  Okay.  Does Mr. Informant say to you I, Mr.
18 Informant, also saw what Mr. Witness has told me about?
19    A  No, they did not.
20    Q  What information did Mr. Informant give you
21 about the reliability or credibility of Mr. Witness?
22    A  At that point I don't remember specifically.
23 This individual stated the information that was given to

Page 47

1 me that I believe to be reasonable and they believe to
2 be reasonable and that's what we acted on.
3     Q  If you recall, did Mr. Informant simply refer
4 to a guy, a woman, or did he give you a specific name of
5 an individual that you recognized?
6     A  I don't remember.
7     Q  Okay.  And the content of the information was
8 that Mr. Witness had been in the Johnson residence, that
9 Mr. Witness had apparently looked in the bedroom that
10 was next to Ms. Johnson's bedroom and Mr. Witness
11 apparently saw what appeared to be drugs lying in open
12 view on the bed, and that bedroom happened to be locked
13 with a padlock?
14    A  That's correct.
15    Q  That the substance?
16    A  That's what I stated in my report.
17    Q  Did Mr. Witness indicate in any fashion to Mr.
18 Informant who related to you the amount of the drugs?
19    A  I believe they -- just what they believed to
20 be a large quantity.
21    Q  Was there any other information given to you
22 to suggest that the drugs were being actively
23 distributed at that time from those premises?

Page 48

1     A  I'm not certain that that was stated, no.
2     Q  Did Mr. Informant tell you when Mr. Witness
3 had made the observations that were reported to you
4 through Mr. Informant?  What day, what time?
5     A  What time the witness had stated they had seen
6 the drugs?  As I stated in the report or as I recollect,
7 it was in the late hours of the day before which was
8 Thursday.
9     Q  And finally, did Mr. Witness indicate to Mr.
10 Informant how long the drugs were expected to be in that
11 location?
12    A  As I was told, if it wasn't acted on within
13 the end of the week then of course by Monday it might
14 not be there.  That's reasonable expectation.
15    Q  You didn't make any reference to that last
16 fact in your report, did you?
17    A  I'm not certain of that whether I did or not.
18    Q  I'll represent to you you make no mention of
19 there being any time limitation in getting the drugs.
20 At this point do you have a recollection specifically?
21    A  That may have been stated.  Of course, if
22 you're going into a weekend and days go by I suppose
23 there is a reasonable expectation that something may not

Ex - 2

Page 49

1  be there days later.
2      Q  What I'm asking you to do under oath, if
3  you're able to, is to separate your own experience and
4  you know if there's drug dealing going on and there is a
5  weekend and if you wait three days nothings there from
6  you specifically hearing the informant tell you that
7  fact. Are you able to tell us conclusively that he told
8  you that rather than you thinking, well, here's a
9  weekend. We got to get over there before the weekend?
10     A  I can't specifically recollect, you know, them
11  stating that to me. I don't remember that.
12     Q  Okay. About what time of the morning was it
13  when you received the call?
14     A  I think it was around nine, 9:30. I think we
15  had the meeting I believe at Village as ten o'clock so
16  --
17     Q  And what was your responsibility with regard
18  to the Village that you mentioned that morning?
19     A  It was I had taken the people in my unit
20  dealing with the people in the Village Drug Program so
21  we were required to take the officers over there to meet
22  the people in the program so they understood where it
23  was, who they were, and who the counselors were and who

Page 50

1  was in the program.
2      Q  How long did that task take?
3      A  It took until after lunch. I didn't get back
4  until I recollect almost 12:30, quarter of one I think
5  it was. It was fairly late.
6      Q  During the course of your several hours at the
7  Village, did you make any attempt to contact any
8  supervisory personnel regarding the information that had
9  been given to you?
10     A  No. At that point I, as I stated, I didn't
11  know what I was going to do or not do. I was obligated
12  to that at that point in time.
13     Q  It's fair to say that you did not so call stop
14  in your tracks, stop what you were doing to devote
15  yourself to the investigation but went on with your
16  morning activities?
17     A  That is a fair assessment. There were other
18  obligations I guess you would say.
19     Q  Do you remember if you had lunch that day?
20     A  I don't think so or dinner if you want to know
21  the truth.
22     Q  Helpful. Was it when you came back to your
23  office that you again began to deal with the Johnson

Page 51

1  information?
2      A  That's correct.
3      Q  And how long after you started to deal with it
4  did you realize that you wanted to contact Mr. Scully?
5      A  Before -- as I stated before, obviously before
6  I left I had to make sure I had enough people to go with
7  me or I wasn't going to go anywhere. You follow the
8  prescripts of our department. I wasn't going to go
9  there myself. I had to have enough people, certainly a
10  female because I was dealing with a female offender.
11     First, I talked to some people and found out
12  who was there and they're willing to devote their time.
13  You're getting into late hours on Friday. We do work a
14  37 and a half work week. A lot of people were finishing
15  up their week and able to leave. You're asking people
16  to assist you on something that's going to go into after
17  work hours. There's issues of compensatory time.
18  Larger issues than just let's run out there and do what
19  we're going to do.
20     I rounded up the people and explained the
21  situation and Mark and I, as I said, said, let's call
22  Tom and tell him what we're going to do and that was our
23  next move.

Page 52

1      Q  When did you make the decision that you were
2  going to go and do what you ultimately did?
3      A  When I called the residence and Ms. Johnson
4  said I'm here but I'm getting ready to leave. It was
5  like, okay, if we're going to do this, we have to go
6  now.
7      Q  That would be after you returned to your
8  office from your Village foray?
9      A  Uh-huh.
10     Q  Would you give us your best estimate how much
11  time elapsed from the time you decided to go to the
12  residence until you actually departed the building?
13     A  It may have been stated in my report. I
14  believe we left at 1:35 as I had written. And I may
15  have began working on this, you know, the whole time
16  frame may have been 40 minutes, but I'm not sure.
17     Q  I'm handing you State's Exhibit No. 1, I
18  believe. You have it. You have State's Exhibit No. 1?
19     A  Uh-huh.
20     Q  And you notice in the right-hand side, is
21  there a copy for the Court?
22     MS. KELSEY: Do I have an extra one? No.
23     MR. HURLEY: Sorry. I don't have a copy.

Ex - 3

CondenseIt™

Page 53

1  Right-hand side it is entitled in bold print pre-search
2  checklist must be attached to detailed arrest/incident
3  report. You see that?
4      A  Uh-huh.
5      Q  My first question is, did you or anybody
6  involved in this investigation complete this pre-search
7  checklist before you left the building that day?
8      A  No.
9      Q  Was this pre-search checklist ever completed?
10     A  Not to my recollection.
11     Q  And therefore, the language, must be attached
12  to detailed arrest/incident report, was not satisfied
13  because it was never prepared, was it?
14     A  As I stated, it wasn't requested to do that.
15     Q  Going on down four paragraphs under the title
16  of Decision to Search the language reads, quote,
17  Information from the informant is corroborated, close
18  quote.
19         Did you in any way independently corroborate
20  what the confidential informant had told you that
21  morning?
22     A  Well, as I stated, the informant was someone
23  that I believed to be reliable individual, that I knew

Page 54

1  to be reliable. And there was -- that stage that was
2  acceptable enough in my capacity to make that decision
3  that that was acceptable information.
4      Q  Other than relying upon the reliability of the
5  confidential informant, however, you had no information
6  regarding the reliability of the witness?
7      A  At that time, no.
8      Q  The next paragraph after where I have just
9  read the quotation reads, quote, approval obtained from
10  supervisor, slash mark, manager, slash mark, director.
11  If not, only extreme exigent circumstances should be
12  cause to proceed. You see that?
13     A  Yes, sir.
14     Q  And did you reach a conclusion that there were
15  in fact extreme exigent circumstances at that point?
16     A  At that point in time, yes, sir, there were.
17     Q  And you've already pointed out it is a Friday
18  afternoon. It's getting late. You have to have a
19  certain amount of people to go. You have to have one of
20  the right gender and administrative problems that came
21  out of all that created an exigent circumstance?
22     A  You have to understand the paging system is a
23  State system. Everyone is connected to the State

Page 55

1  system. That system was down which means you couldn't
2  get a hold of anybody. Used as much time as prudently
3  possible to contact people before we had to at least go
4  to make sure there was someone still in the residence.
5  And as I stated, when we went to the residence we
6  continued and waited to get approval before we had done
7  anything. So I don't know how much more we were
8  expected to do at that point.
9      Q  Is there any particular reason you didn't
10  bother to complete the pre-search checklist?
11     A  As I stated, at that point, I didn't believe
12  we were requested to do it. I fill out the incident
13  report and that's about as much as I can recollect.
14     Q  Okay. Could I have 718, procedure number 718
15  introduced?
16        MS. KELSEY: Which one? The new one or the
17  old one?
18        MR. HURLEY: I would offer into evidence at
19  this time what is noted Procedure number 7.18 for the
20  purpose of this hearing only.
21        THE COURT: Any objection?
22        MS. KELSEY: No, your Honor.
23        THE COURT: So admitted.

Page 56

1         THE CLERK: Marked as Defendant's Exhibit 1.
2         (Procedure number 7.18 marked as Defendant's
3  Exhibit No. 1.)
4         MR. HURLEY: May I hand it to the witness?
5         THE COURT: You may.
6  BY MR. HURLEY:
7      Q  Just take whatever time you need to
8  familiarize yourself with the contents. Then I have a
9  question.
10     A  Okay.
11     Q  Is it fair to say that this sets out
12  procedures that are to be employed when there is going
13  to be a personal search of a living quarters or property
14  of a probationer?
15     A  That's correct.
16     Q  And is it fair to say that you did not
17  scrupulously follow each of the directives contained in
18  this?
19     A  In what manner?
20     Q  Do you see anything here that suggests to you
21  that your behavior did not comport with what this says
22  you're supposed to do?
23     A  Within 48 hours of the search or reasonable

EX - 4

Page 57

1 justification provided for a later completion time,
2 completing the checklist within 48 hours.
3    Q Other than that, you feel you complied with
4 the letter of the law here?
5    A Uh-huh.
6    Q Okay. When the pager did not work for you to
7 reach Mr. Scully, you then asked Rita Chiappardi,
8 C-H-I-A-P-P-A-R-D-I, a secretary, to try to reach Mr.
9 Scully?
10    A That is correct.
11    Q Did you give her information to allow her to
12 reach him where he would be, his telephone number, do
13 you rely upon her to find out?
14    A No. We had a cellular bag phone and we asked
15 her if she finds him, he was at the diversity training,
16 to have him call us on that phone so we could proceed.
17    Q And that was in your effort to comply with the
18 directives and procedures. That's why you were trying
19 to --
20    A As far as, yes. We weren't going to proceed
21 without some type of supervisory approval. As I stated,
22 I mean, every attempt that we could to find somebody
23 without driving to diversity training, wherever it was.

Page 58

1    Q Somebody in your office must have known where
2 the diversity training site was, didn't they?
3    A As I stated, I didn't. Mr. Herron didn't. As
4 I stated, some went to the diversity training, some
5 people went to the other office. Some people may have
6 gone home. We were trying to find whoever was
7 available. Mr. Scully was the acting duty supervisor.
8    Q That's why you were trying to reach him?
9    A Uh-huh.
10    Q And undertake any investigation just asking
11 around, hey, where they doing the diversity training.?
12    A That's why we were speaking to the
13 administrative secretary because she would be the one to
14 know where, hopefully, where everyone was and she was
15 attempting to find where they were at the diversity
16 training. And we stated when you find Tom, have him
17 call this number.
18    Q It was your understanding she simply wouldn't
19 rely solely on this paging system which wasn't working?
20    A That was what she was trying to do. We stated
21 we're going to go over there because she's leaving and
22 that's where we'll be waiting for him to call.
23    Q Do you recall how long after you asked Rita to

Page 59

1 get involved in trying to reach Scully was before you
2 left the premises to go to the house?
3    A We left -- when we told her that, we left
4 almost immediately. We told her this is where we're
5 going to be. This is where we are and we left.
6    Q All right. You arrive at the house and the
7 probationer that you supervise was Norma Johnson?
8    A That's correct.
9    Q You were not the probation officer nor had
10 probation, specific probation responsibilities with
11 regard to Curtis McAllister?
12    A Not as his specific supervising officer, no.
13    Q She allowed you to come into the house
14 voluntarily?
15    A That's correct.
16    Q And at that point there were four probation
17 persons?
18    A Including myself there was four.
19    Q Four. Okay. And during the course of
20 conversation with her lasting some five to ten minutes,
21 were you able to ascertain that the bedroom that was not
22 padlocked, the left bedroom, was her bedroom?
23    A That's correct.

Page 60

1    Q She indicated the bedroom that was to the
2 right and bore the padlock was the bedroom of Mr.
3 McAllister?
4    A That's correct.
5    Q When you saw Mr. McAllister arrive and get out
6 of his vehicle, would you describe what he did and you
7 did that he ended up being in the living room of the
8 house?
9    A I opened the door and walked out down the
10 stoop. As he was walking up I said, as I stated, I
11 said, Hello, Curtis. Do you remember me? I'm Mr.
12 Morehart. He said yes. I said, could you come inside
13 for a minute. We're trying to figure some things out
14 here.
15    Q You're not purporting to quote, could you come
16 inside as opposed to come inside because we have
17 something we want to talk about, for example?
18    A No. I don't specifically remember exactly
19 what I said. It was something to the effect, could you
20 come inside? We're trying to figure some things out
21 here.
22    Q He walked in on his own power?
23    A Yes.

Ex-5

Page 61

1  Q  Once he was inside where was he placed?
2  A  He was -- stood in the middle of the living
3  room with his back to the couch as I remember.
4  Q  And were you the sole speaker to him at that
5  point in time initially when he was brought inside?
6  A  For the majority of that conversation, yes. I
7  told him why we are there and what we were looking for
8  and the information that we had received.
9  Q  After you told him the nature of the
10  information you had received and what you intended to
11  do, what was the next thing that happened?
12  A  Mr. McAllister became, for lack of a better
13  word, rather antsy, starts moving around, listing from
14  left to right. Started sweating profusely, rubbing his
15  head, saying well oh, oh, oh. He became very hesitant
16  in his answers. And began rock -- started rocking back
17  and forth a little bit. When I told him we were here to
18  search the right-hand bedroom which we believed to be
19  his, at that point he made a move to run out of the
20  dwelling.
21  Q  Okay. By the time he made the move to depart
22  the dwelling, had you specifically asked him if he had
23  the key to the padlock?

Page 62

1  A  Yes. We were engaged in that conversation
2  whose room it was.
3  Q  What did he reply regarding his having the key
4  to the padlock?
5  A  He stated it was his -- that he had stayed
6  sometimes with Norma but it was his room. And that he
7  was -- he had the key to the padlock because he was
8  going to rent it out but it was his room. He had the
9  key to it.
10  Q  Did you, before he started to depart,
11  specifically ask him for the key?
12  A  I believe we told him we wanted the key to
13  look in the room to make sure there was no drugs in the
14  room.
15  Q  It was about that time you started to see the
16  visceral reactions that you described?
17  A  That's correct.
18  Q  And you mention that he tried to -- I think
19  you said run. Was it literally a run or fast walking
20  toward the front door?
21  A  He bolted to the door for lack of a better
22  word. He attempted to leave the dwelling.
23  Q  Mr. Cocuzza was able to block him?

Page 63

1  A  He was standing in front of him with Ms.
2  Whiteside on the other side, Mr. Cocuzza.
3  Q  He stood in the way and grabbed a hold of him
4  and kept him from going out the door?
5  A  That's correct.
6  Q  As soon as he'd been restrained from Cocuzza
7  who is it that cuffed Mr. McAllister?
8  A  I believe -- as I believe -- I believe -- I
9  don't remember specifically whether it was Mr. Herron or
10  myself. We were both engaged in the process because he
11  was combative and started to struggle a little bit.
12  Q  By combative, you don't mean that he's trying
13  to duke it out with you, simply wrestling to get away?
14  A  Yes. To evade, yes.
15  Q  At that point, by the time you have him
16  successfully handcuffed, you have not yet had any
17  dialogue with Mr. Scully to approve what was going on?
18  A  No, not at that time.
19  Q  You had not had any contact with the probation
20  officer who is assigned to supervise Mr. McAllister that
21  day?
22  A  Mr. Dudzinski, no.
23  Q  As soon as he's handcuffed, what is done with

Page 64

1  him?
2  A  He's -- we conduct a search of his person for
3  the safety of ourselves and the people in the room to
4  make sure there is no weapons or so forth on him, as I
5  stated.
6  Q  Who did that?
7  A  I did that.
8  Q  And would you explain to us how you conducted
9  that search in terms of externally only or intrusions
10  into pockets and other places?
11  A  You cursory -- when you pat someone down,
12  you're looking on the outside of pockets and you ask
13  them if they have anything in the pocket that will
14  protrude or stick into me. And you search blue jeans,
15  you search the pockets of the jeans, and inside a black
16  leather jacket making sure he doesn't have anything
17  inside the jacket or down his pants legs.
18  Q  As part of your protective frisk that
19  particular day, you located money in his right front
20  pants pocket?
21  A  That is correct.
22  Q  I suppose you felt it on the outside first?
23  A  That's correct. Rather large.

Ex - 6

Page 65

1   Q  $589 in tens and twenties?
2   A  I didn't -- it was a large amount of money.  I
3  didn't count it.  I pulled it out.  You could see how
4  much that it was more than just $10 or however much.
5  And I put it on the -- I laid it on a coffee table and
6  it stayed there until it was taken into custody by the
7  Wilmington Police.
8   Q  With regard to the key on the key ring, would
9  you explain the play by play of how that was taken,
10  secured by you?
11   A  I believe Mr. -- Officer Herron had the key
12  chain and asked him which -- was this the key, is this
13  the key.  But I don't remember specifically.  You can
14  ask him.
15   Q  Do you remember specifically that it was not
16  you who obtained possession of the key?
17   A  No.  It was Officer Herron had possession of
18  it.
19   Q  As you sit here, you don't have a specific
20  recollection, do you, you actually seeing whatever,
21  Officer Herron in order to gain possession of the key
22  ring?
23   A  No.  As I stated what happened, he may have

Page 66

1  pulled the keys from his coat jacket or he may have had
2  them in his hand when he came in.  One way or the other,
3  we obtained the keys.  I think he may have had them in
4  his hand.
5   Q  What question did Officer Herron pose to Mr.
6  McAllister after Officer Herron had the key ring?
7   A  I believe at that point he was asking him
8  which key fit the padlock, but you can ask Officer
9  Herron that.
10   Q  Do you recall whether or not Mr. McAllister
11  responded in any way to that?
12   A  No, I don't.
13   Q  Now, at that point in time, how much time had
14  passed from your conversation with Rita until where we
15  are in the chronology?
16   A  To tell you the truth, I have no idea.  It
17  could have been -- I have no idea.
18   Q  Had you left word with Rita what she was to do
19  if she contacted Scully, did you give her a number to
20  call you or what did you do?
21   A  At that point I believe, and you can ask
22  Officer Herron, I think he had called back from the
23  phone in the house itself and given them that phone

Page 67

1  number and said to Rita, have you gotten through to Tom
2  yet.  And give him that phone number in case the cell
3  phone number went bad or couldn't get through on that.
4  And at that point, some minutes after that, as I stated,
5  the Wilmington Police were called.  They arrived and Mr.
6  Scully had called.  And Mr. Herron spoke to Mr. Scully
7  as I stated.  You'll have to ask him.
8   Q  You didn't get involved in that?
9   A  No, I was not.  I had Ms. Johnson also to deal
10  with too.
11   Q  And by the time Scully and Herron talked the
12  defendant has already been handcuffed, the defendant has
13  already been searched, the key in question has already
14  been secured by the authorities but the key had not as
15  of that moment been placed in the padlock?
16   A  No, no.  We weren't proceeding until, as I
17  stated, until we had procured some type of supervisor
18  approval.  Whether or not at that point we were
19  obligated or not that's the path we were going down that
20  I wanted to go.  We weren't going to proceed until we
21  contacted somebody.
22   Q  All of the information that you had at the
23  moment that the key was inserted into the padlock was

Page 68

1  that the room inside was under the control of Mr.
2  McAllister, not your probationer, Norma Johnson?
3   A  That's correct.
4   Q  In fact, she said she didn't even have a key
5  to that bedroom?
6   A  That's correct.  She said she did not have a
7  key.
8   Q  And you don't know I presume whether or not
9  Mr. Herron mentioned the distinction between your
10  probationer, Norma Johnson versus Curtis McAllister,
11  your nonprobationer?
12   A  In reference to what?
13   Q  In seeking advice as to what to do.  You
14  didn't hear what Herron was saying on the telephone?
15   A  No, no.
16   Q  Okay.  There's one other item I would like to
17  have admitted unless you're going to do it.  719.  You
18  going to do it later?
19   MS. KELSEY:  You can stick it in there.
20   MR. HURLEY:  You don't have an extra copy I
21  presume.
22   MS. KELSEY:  Huh-uh.
23   MR. HURLEY:  I move to offer Defendant's

EX-7